FILED
United States Court of Appeals
Tenth Circuit

April 30, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

NARENDRA RAJ KARKI,

      Petitioner,

     v.

ERIC H. HOLDER, JR., United States
Attorney General,

      Respondent.

No. 12-9550

_____

**ON PETITION FOR REVIEW FROM
THE BOARD OF IMMIGRATION APPEALS**

_____

Submitted on the briefs:[*]

Khagendra Gharti-Chhetry, New York, New York, for Petitioner.

Stuart F. Delery, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice; Ethan B. Kanter, Deputy Chief, National Security Unit, Office of Immigration Litigation; Paul F. Stone, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for Respondent.

_____

Before **KELLY**, **McKAY**, and **O'BRIEN**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

     [*] After examining the briefs and the appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Petitioner Narendra Raj Karki, a native and citizen of Nepal, petitions for review of a decision of the Board of Immigration Appeals (BIA) affirming an order of the immigration judge (IJ) that denied his application for asylum and restriction on removal under the Immigration and Nationality Act (INA) and protection under the United Nations Convention Against Torture (CAT).

## BACKGROUND

Petitioner entered the United States in October 2007 in order to present a paper at a forestry conference in Oregon. His visitor's visa authorized him to remain in the country until November 6, 2007. On November 14, 2007, Petitioner filed an asylum application, which was denied by an asylum officer and referred to an immigration judge. Removal proceedings were initiated against him in February 2008. At the removal proceedings, Petitioner renewed his application for asylum and sought restriction on removal under the INA and protection under the CAT, claiming that he had suffered past persecution and feared future persecution based on his political opinion and membership in a particular social group. He testified at the January 20, 2010 hearing through an interpreter. His father, Man Bahadur Karki, also testified at the hearing.

*A. Factual Background*

Petitioner was born in August 1961 in Nepal. He has a wife and two daughters, who remained in Nepal when he came to the United States. At the time of the hearing, his older brother was a lawful resident in the United States, having entered this country in

1995 to complete his Ph.D. Petitioner's younger brother had entered the United States in 2004, had been granted asylum, and was also completing a Ph.D. Petitioner also has a sister, who apparently still lived in Nepal at the time of the hearing.

At the immigration hearing, Petitioner testified that he had experienced past persecution and feared future persecution from Maoists in Nepal because the Maoists opposed both his work on financial development projects and his support of the Nepali Congress party. Petitioner, who has an MBA, worked for several years for a forestry and national parks project under the United Nations Development Program (UNDP), where his job was to train and organize the public in financial development and related projects. As part of this work, Petitioner "used to talk about the human rights, and the development," and trained individuals on "how to bring income and how to develop the market management." (R. at 121.) He emphasized the importance of economic development and "always like[d to] bring the awareness to the public as a democratic principle." (R. at 139.) In the course of his work for the UNDP, Petitioner drove to different villages to speak to the villagers about these ideas. When he did so, he testified, the Maoists would sometimes stop him on the road and harass him, and they "always told [him] to stop talking about democracy and try not to help to bring income to the public." (R. at 122.) He testified that the Maoists demanded that he not talk to the public about financial development, democracy, and other issues of public awareness because it was "against . . . their principle" for the public to develop and earn money. (R. at 121.)

Petitioner testified that he was also persecuted by the Maoists based on his support

of the Nepali Congress party, which promotes democratic principles and opposes the communist ideology promoted by the Maoists. Petitioner testified that, due to his father's political background in the Nepali Congress party, he and his three siblings were all involved in politics. He said that he was involved with the Nepali Student Union when he was a student. After he finished his education, he was a district secretary or assistant in the Makwanpur District for the Nepali Congress Party, assisting the president and vice president of the party, producing pamphlets and other documents, and doing work for the village. He spent eight to twelve hours a month working for the party. At the immigration hearing, Petitioner originally testified that he was a member of the Nepali Congress party. For corroboration, Petitioner produced a letter written by the district chairman of the Nepali Congress Party which identified Petitioner's father as an "active party member" and Petitioner as a "regular supporter" of the party. (R. at 260.) The letter stated that Petitioner regularly participated in various political assemblies and other party events, provided financial support to the party, and was "a bona fide, very active and devoted on democracy." (R. at 260.) The immigration judge pointed out that this letter did not identify Petitioner as a member of the party. Petitioner then testified that he had been a member of the Nepali Congress party in earlier years, but his work with the UNDP prevented him from maintaining active membership in the party after 1997. However, he continued to support the party. Petitioner told the IJ that he had an old party membership card, but he did not bring it to the United States because he was not planning on applying for asylum when he came here.

-4-

Petitioner testified that the Maoists made verbal and written requests for donations from time to time. He refused these requests, but they sometimes took the money he had in his pockets by force when he encountered them in the field. He said that the Maoists also asked him for gasoline, stationary, and printing, but he never gave them these things. He testified that the Maoists planted a flag on a rice field he owned in Nepal and took control over it, then asked his father for 50,000 rupees to get the land back. Petitioner said that he had learned about this incident shortly after he came to the United States in October 2007.

Petitioner also testified about three specific instances of attempted or actual physical violence directed at him or his family members. First, Petitioner testified that on May 22, 2004, the Maoists exploded a bomb at his aunt and uncle's house, killing his aunt. Petitioner testified that the Maoists took responsibility for this attack and said it was because his uncle had been a major in the Nepal Army and was a supporter of the Nepali Congress Party. Petitioner provided newspaper articles corroborating this account. Petitioner further testified that the Maoists called his home the next day when his wife and his parents were there and threatened that his immediate family would meet the same fate "if you do anything against us." (R. at 124.)

Second, approximately five months later, on November 21, 2004, five of Petitioner's colleagues were killed when the UNDP vehicle in which they were riding was bombed. Petitioner had intended to leave the office with them to go to the field, but, at the last minute, his boss held him back to help with another task, and he thus escaped

harm. Petitioner testified that he later learned the bomb was intended for him. Specifically, he testified that the villagers told him the Maoists went to a village meeting and told the people that Petitioner was the intended target of the attack, "and one day we will get him." (R. at 148.) Petitioner also provided a newspaper article reporting that "Maoist cadres had ambushed and blown away Parsa Wildlife Reserve's vehicle with suspicions that Mr. Karki was traveling in the vehicle." (R. at 209.) The article further reported, "It has been learnt from his neighbors that Mr. Karki and his family have left his home and hide in different places for safety." (R. at 209.) Petitioner testified that he still feels very bad when he sees the photographs of the aftermath of the attack and thinks of the way his friends were killed. He is also still upset by his memories of the gruesome scene, which he had to personally witness when he assisted at the scene after the attack. He testified, "I still feel bad because one of our driver[s] was killed in that bomb, and his body was hanging on the top of the tree, about 65 feet, and we had to take it out, piece by piece, and I feel really agitated, . . . still thinking about that." (R. at 123.)

Third, Petitioner testified about a physical assault he suffered on August 19, 2007. While he was walking home in the evening after returning from field work, he was attacked by three or four young Maoists who screamed, "Nepali government supporter is coming, get him, get him." (R. at 124.) He fell to the ground while attempting to run away, and the boys dragged him and beat him, injuring his elbow, knees, shoulder, and back. At the end of the attack, the boys said, "long live Maoist, . . . death for the democratic supporters." (R. at 125.) Petitioner testified that some neighbors heard the

noise and saved him. They took him to the hospital, where he was treated and given pain medication. Petitioner corroborated his account with an August 19 hospital document stating "C/O: 1. Physical Assault. 2. Bruises on wrists and face. 3. Semi-uncons[c]ious." (R. at 216.) The document indicates that Petitioner was x-rayed, given an injection, and advised to take medication upon discharge. Petitioner testified that he did not suffer any permanent injuries from the assault.

Petitioner explained that he never sought help from the police in Nepal in connection with those attacks because the Maoists had threatened his life if he reported them to the police. He also thought it would be difficult for the police to actually help him because the Maoists had power, so the police themselves were not secure.

Petitioner testified that he decided to apply for asylum after arriving in the United States because his wife told him over the telephone that it would be dangerous for him to return to Nepal. Petitioner testified he was on the Maoists' "black list," and "[w]hoever is in the black list, those people will kill and make handicapped." (R. at 126.) He testified that it was not easy for his wife and children to remain in Nepal. He said the Maoists called his house there from time to time, threatening his wife and asking, "where is your husband? Where is that congress supporter?" (R. at 125.) His wife never told the Maoists that he was in the United States. His wife and children sometimes stayed with her parents or with friends, and, as a result, his children's education had been affected. Petitioner testified that the Maoists do not harm women and children directly, but he considered his wife to be enduring mental torture because the Maoists regularly asked her

where he was, suggested they might take his daughters to join in their group, and repeatedly asked for money and food. Petitioner's wife wanted him to bring her and the children to the United States.

Petitioner testified that he filled out his asylum application himself, with help from two friends of one of his brothers. In response to two specific questions about his or his family's involvement in organizations such as political parties, Petitioner typed only: "My father is a retired government official and is a member of democratic party in Nepal," and "My father still associated with democratic party in Nepal and speaks for democratic values including freely speaking and writing rights." (R. at 272.) The IJ asked him why he had not written on his asylum application that he had been a member of the Nepali Congress Party as he testified at the hearing. Petitioner told the IJ he thought the statement about his father would cover the whole family because his father was the head of the family. He further stated that he might not have understood the question.

Petitioner acknowledged, in response to questions from the IJ, that the State Department report correctly stated that the Maoists tried to extort money from tourists and anybody else they thought had money. But he testified the Maoists specifically targeted him because he was a Nepali Congress Party supporter and because he had helped "the public to increase the economic[] condition and . . . always educate[d] them to self-sustain themselves, and that is against [the Maoists'] principle." (R. at 138.) He asserted that the Maoists were more interested in him for his political beliefs than for his

money because he was "the democratic supporter and [he] always like[d to] bring the awareness to the public as a democratic principle. And also [he] emphasize[d the need] to develop the . . . economic. But communism is not that." (R. at 139.) He said the Maoists would not be satisfied if he gave them money, but would want him to join their organization because he could bring others with him. He said he never considered joining the Maoists because he supported the Nepali Congress Party and democracy. He did not have a letter from the Maoists telling him in writing to stop his activities of advancing democracy, but he said they called him and his wife on the phone and told him "verbally [to] just leave the party and join their party." (R. at 139.)

Petitioner's seventy-four-year-old father entered the United States six months before the immigration hearing on a tourist visa good for five years. Petitioner's father testified that Petitioner had been supporting and helping the Nepali Congress party since he was a child, under his father's guidance. Petitioner's father testified that, when the Maoists visited his house, they always asked about Petitioner, said he should tell Petitioner to join and support the Maoists, and threatened to kill Petitioner if he did not support the Maoists. He explained that, although he also feared the Maoists, he was getting old and was "ready to die," and he therefore did not worry about his own future. (R. at 162.) However, he said he was very fearful and worried about his son's life, and he repeatedly begged the IJ to save Petitioner's life. Petitioner also testified that his parents faced less of a threat because of their age, since the Maoists do not directly attack the elderly.

## B. The IJ's Decision

After the January 20, 2010 hearing, the IJ ordered Petitioner removed to Nepal. In his decision, the IJ reviewed the hearing testimony and Petitioner's corroborating evidence. The IJ found that Petitioner was "not a completely credible witness" because he had embellished his testimony by stating he was a member of the Nepali Congress party, when he was actually just a supporter. (R. at 55.) The IJ concluded that Petitioner had embellished his testimony on this point "in order to cure one of the main problems with his application for asylum, and that is whether or not there is a nexus between [his] fear of return to Nepal, and one of the protected grounds." (R. at 55-56.) The IJ stressed "[t]he necessity of showing that connection" in order to qualify for asylum or restriction on removal under the INA. (R. at 57.)

The IJ concluded that Petitioner had failed to establish a nexus between his alleged fear of persecution and a statutorily protected ground. The IJ concluded that the Maoists approached him only to extort money and recruit him for their organization. "In other words, they are interested in his contribution to their organization; they are not interested in harming him because of any political opinion or any social group membership." (R. at 58.) The IJ also concluded that Petitioner failed to show past persecution because he was not harmed in the bombing attack in which his coworkers were killed, and he suffered no permanent injuries in the August 19 assault. The IJ reasoned that Petitioner's father's willingness to return to Nepal also "tend[ed] to negate the reasonableness of any fear which [Petitioner] may have." (R. at 58.) Finally, the IJ concluded there was no evidence

-10-

that the government of Nepal would harm Petitioner or acquiesce in his torture. The IJ accordingly denied Petitioner any relief.

## C. The BIA's Decision

On appeal, the Board of Immigration Appeals rejected the IJ's conclusion that Petitioner was not completely credible. The BIA agreed that Petitioner had embellished his testimony regarding his affiliation with the Nepali Congress party, but the BIA concluded that this embellishment only affected Petitioner's burden of persuasion, not his credibility. However, the BIA agreed with the IJ that Petitioner was not entitled to relief under the INA or CAT. The BIA agreed that the Maoists' actions toward Petitioner were motivated by their desire to extort money or recruit him, and the BIA concluded that "[t]he record does not reflect that Maoists had the intention to persecute [Petitioner] even partly because of his political opinion or a political opinion imputed to him." (R. at 4.) The BIA affirmed the IJ's conclusion that the incidents described by Petitioner did not rise to the level of past persecution. The BIA also agreed with the IJ that Petitioner's father's willingness to return to Nepal negated the reasonableness of Petitioner's asserted fear of returning to Nepal. The BIA thus concluded that Petitioner was not eligible for asylum or restriction on removal because he had not shown past persecution or a fear of future persecution based on his political opinion. The BIA further concluded that Petitioner was not eligible for relief under the CAT because he had not shown that the government of Nepal was likely to torture him or acquiesce in his torture if he returned to Nepal. The BIA accordingly dismissed Petitioner's appeal. Petitioner petitions for

-11-

review of that decision.

## DISCUSSION

"In our review of the agency's decision, we decide purely legal questions *de novo*." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011). "Agency findings of fact are reviewed under the substantial evidence standard." *Id.* Thus, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Under this standard, "our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006) (internal quotation marks and brackets omitted). "Although our review of the BIA's conclusion that a person does not have a well-founded fear of persecution is deferential, the BIA may not simply overlook evidence in the record that supports the applicant's case." *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 113 (3d Cir. 2010). "[T]he BIA is not permitted simply to ignore or misconstrue evidence in the asylum applicant's favor." *Id.* at 107. While we review the BIA's decision, not the IJ's, we "may consult the IJ's opinion to the extent that the BIA relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007). "Finally, our review is confined to the reasoning given by the [agency], and we will not independently search the record for alternative bases to affirm." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004).

Because Petitioner applied for asylum following the enactment of the REAL ID

-12-

Act in 2005, his burden of proof is set forth in 8 U.S.C. § 1158(b)(1)(B)(i). To qualify for asylum, Petitioner must establish refugee status, which requires proof that his "'race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting [him].'" *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010) (quoting § 1158(b)(1)(B)(i)). "[T]he BIA [has] interpreted 'one central reason' to mean 'the protected ground cannot play a minor role in the alien's past mistreatment or fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm.'" *Id.* (quoting *In re J-B-N & S-M*, 24 I.&N. Dec. 208, 214 (BIA 2007)).

There are essentially three ways to establish refugee status: (1) showing a well-founded fear of future persecution; (2) showing past persecution, which creates a rebuttable presumption of a well-founded fear of future persecution; and (3) showing "past persecution so severe as to demonstrate compelling reasons for being unwilling or unable to return," even without any danger of future persecution. *Krastev v. INS*, 292 F.3d 1268, 1270-71 (10th Cir. 2002) (internal quotation marks omitted). "Aliens basing their asylum claims upon a well-founded fear of future persecution must show both a genuine, subjective fear of persecution, and an objective basis by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1046 (10th Cir. 2004) (internal quotation marks omitted). "Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as

-13-

offensive, and requires more than just restrictions or threats to life and liberty."
*Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (internal quotation marks omitted). "Persecution under this section means not only persecution by the government but also by a non-governmental group that the government is unwilling or unable to control." *Estrada-Escobar*, 376 F.3d at 1046 (internal quotation marks omitted). "Once an applicant has established his or her refugee status and thus eligibility for asylum, the Attorney General exercises discretionary judgment in either granting or denying asylum." *Krastev*, 292 F.3d at 1271 (internal quotation marks omitted).

Restriction of removal likewise requires an applicant to prove persecution based on one of the protected grounds. To be entitled to restriction on removal, an applicant must show a "'clear probability of persecution' on account of one of the statutorily protected grounds." *Uanrerero*, 443 F.3d at 1202 (quoting *Elzour*, 378 F.3d at 1149). "Applicants who cannot establish a well-founded fear under asylum standards will necessarily fail to meet the higher burden of proof required for [restriction on] removal." *Id.*; *see also* 8 U.S.C. § 1231(b)(3). However, "[a]lthough a grant of asylum is in the discretion of the Attorney General, restriction on removal is granted to qualified aliens as a matter of right." *Ismaiel v. Mukasey*, 516 F.3d 1198, 1204 (10th Cir. 2008).

Petitioner argues that the BIA and IJ erred in concluding he failed to show past persecution, a well-founded fear of future persecution, and a nexus between the alleged persecution and his political opinion. He also argues that the BIA and IJ erred in concluding he had not established his entitlement to relief under the CAT. We address

each argument in turn, beginning with Petitioner's argument regarding the nexus between the alleged Maoist persecution and his political opinion.

## A. *Nexus between persecution and political opinion*

The BIA concluded that the Maoists' actions toward Petitioner were motivated only by their desire to extort money or recruit him and that "[t]he record does not reflect that Maoists had the intention to persecute [Petitioner] even partly because of his political opinion or a political opinion imputed to him." (R. at 4.) We agree with Petitioner that this factual determination is not "supported by reasonable, substantial and probative evidence considering the record as a whole." *Uanrerero*, 443 F.3d at 1204.

As Petitioner notes, the BIA rejected the IJ's adverse credibility determination, even though it agreed that Petitioner had embellished his testimony regarding his political affiliation with the Nepali Congress party. However, after indicating that Petitioner's testimony was credible, the BIA improperly ignored substantial, probative testimony demonstrating that the Maoists persecuted Petitioner based on his political opinion. *See Espinosa-Cortez*, 607 F.3d at 107.

Petitioner testified that the Maoists were mainly interested in him because of his pro-democracy beliefs, public advocacy efforts, and support of the Nepali Congress party. His testimony regarding the Maoists' regular harassment while he was working for the UNDP illustrates that the Maoists were both aware of and unhappy with his work in promoting financial development and democratic principles. Far from simply asking him to provide money or join their organization, the Maoists "always told [Petitioner] to stop

-15-

talking about democracy" and "about financial development and other public awareness" issues that were "against . . . their principle." (R. at 121-22.) When the Maoists took responsibility for bombing Petitioner's uncle's house, they asserted that they did so based on the uncle's position in the Nepal Army and his support of the Nepali Congress. They also warned Petitioner's family that they would be treated likewise if they "d[id] anything against [the Maoists]." (R. at 124.) Only a few months later, while Petitioner continued his financial development work for the UNDP, a UNDP vehicle he should have been traveling in was bombed by the Maoists, who told the villagers that Petitioner was their intended target and that they would "get him" one day. (R. at 148.) Petitioner's testimony also established that the Maoist youths who assaulted him in August 2007 specifically targeted him based on his political opinions. They attacked him with cries of "Nepali government supporter is coming, get him," and, after the attack was over, they said, "long live Maoist, . . . death for the democratic supporters." (R. at 124-25.) The Maoists also made threatening phone calls to Petitioner and his wife in which they referred to Petitioner as "that congress supporter" and demanded that he "leave the party." (R. at 125, 139.)

The BIA simply ignored this substantial evidence of the political motivation for the Maoists' actions, relying instead on the fact that the Maoists also attempted to extort Petitioner and recruit him to join their organization, as they do to many individuals in Nepal. However, these extortion and recruitment efforts do not negate Petitioner's testimony that he was specifically targeted and harassed based on his political opinion.

When the BIA overruled the IJ's adverse credibility determination, it became obligated to treat Petitioner's testimony as credible, but it failed to do so. The BIA's conclusion that "[t]he record does not reflect that Maoists had the intention to persecute [Petitioner] even partly because of his political opinion or a political opinion imputed to him" (R. at 4) demonstrates that the BIA impermissibly either ignored or overlooked evidence in the record that supported Petitioner's case. *See Espinosa-Cortez*, 607 F.3d at 107, 113.

In its answer brief, the government relies on the Supreme Court's decision in *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). In that case, the Supreme Court rejected the Ninth Circuit's conclusion that "a guerilla organization's attempt to conscript a person into its military forces necessarily constitutes persecution on account of political opinion." *Id.* at 481 (internal quotation marks and ellipsis omitted). The Court noted that "[e]ven a person who supports a guerilla movement might resist recruitment for a variety of reasons—fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." *Id.* at 482. The Court then stated, "The record in the present case not only failed to show a political motive on Elias-Zacarias' part; it showed the opposite. He testified that he refused to join the guerillas because he was afraid that the government would retaliate against him and his family if he did so." *Id.* The Court rejected the view that "not taking sides with any political faction is itself the affirmative expression of a political opinion." *Id.* at 483. Moreover, even if this were a political opinion, the Court concluded, the petitioner had not shown he had a "'well-founded fear' that the guerillas will persecute him *because of* that political

-17-

opinion, rather than because of his refusal to fight with them." *Id.*

Under *Elias-Zacarias*, an individual's refusal to join an organization is insufficient in itself to demonstrate that the organization's persecution was based on the individual's actual or imputed political opinion, rather than retaliation for the individual's resistance. *See Ustyan v. Ashcroft*, 367 F.3d 1215, 1217-18 (10th Cir. 2004). However, where other factors are present, the individual's political opinion may be a central reason for persecution from a group that attempts to forcibly recruit him, even if the organization's initial targeting of the individual was not politically motivated. In *Ustyan*, we distinguished the situation before us there—a mere refusal to fight—from the facts of the case relied upon by the petitioner, *Melkonian v. Ashcroft*, 320 F.3d 1061 (9th Cir. 2003), where the Ninth Circuit held that a petitioner had demonstrated a well-founded fear of political persecution. In *Melkonian*, we noted, the petitioner had established that (1) "his family felt bound to side with the Georgians"; (2) his family had "suppl[ied] Georgian fighters with fruit and with money for weapons"; (3) "his father-in-law spoke out against [the other side's] tactics and in favor of Georgian Christianity"; and (4) the other side "specifically targeted . . . men [of his ethnicity] to conscript and send to the front line where casualties ordinarily are the highest." *Ustyan*, 367 F.3d at 1217 (citing *Melkonian*, 320 F.3d at 1066-68) (internal quotation marks and brackets omitted). "This evidence was specifically cited by the Ninth Circuit to distinguish the general rule of *Elias-Zacarias*, noted above, that coercive recruitment tactics and an applicant's resistance thereto do not reflect the kind of social/political animus necessary to support an asylum

-18-

claim." *Id.* By contrast, we noted, "Mr. Ustyan ha[d] not cited to any comparable evidence in the record developed for this case." *Id.*

The Third Circuit has likewise distinguished the general rule of *Elias-Zacarias* where there was evidence of more than a mere refusal to concede to forcible recruitment efforts. In *Espinosa-Cortez*, the Third Circuit held that a petitioner had demonstrated past political persecution from the FARC, an anti-government terrorist organization in Colombia, where the petitioner engaged in protracted resistance to FARC's recruitment efforts and "made his anti-FARC views known to his persecutors in rejecting their advances." *Espinosa-Cortez*, 607 F.3d at 112-13. The Third Circuit reasoned:

> [E]ven if . . . Espinosa-Cortez was not *initially* targeted on account of imputed political beliefs . . . he was eventually threatened, at least in part, on account of his political beliefs. That is, a reasonable adjudicator would be compelled to conclude that the FARC, by threatening a government-affiliated person after that person made his anti-FARC views known, had threatened persecution at least in part on account of the victim's political beliefs.

*Id.* Other circuits have reached similar conclusions. *See Martinez-Buendia v. Holder*, 616 F.3d 711, 715-16 (7th Cir. 2010); *Delgado v. Mukasey*, 508 F.3d 702, 707-08 (2d Cir. 2007).

Here, Petitioner demonstrated much more than forcible recruitment efforts. Indeed, from the start, the Maoists' demands focused on Petitioner's public statements regarding democracy, financial development, and other political issues that were against the Maoists' communist principles. We do not see how these demands can be viewed as anything other than politically motivated. Nor does the record support the view that the

-19-

physical attacks on Petitioner and his family were motivated by recruitment or extortion efforts rather than Petitioner's and his family's political opinions. Moreover, as in *Espinosa-Cortez*, the Maoists were aware that Petitioner opposed them on political grounds, since he publicly supported the Nepali Congress party and advocated democratic and economic principles contrary to the Maoists' principles. Indeed, the Maoists specifically referred to Petitioner by his political opinion rather than by another label. For instance, when they made threatening phone calls to his wife, they asked for "that congress supporter" (R. at 125), not "that extortion resister." The record as a whole simply does not support the BIA's conclusion that the Maoists were motivated only by their desire to recruit Petitioner to their cause or extort money from him. Rather, the record compels the conclusion that Petitioner's political opinion was a central reason for the Maoists' actions. We therefore conclude that the agency's decision cannot be upheld on this ground.

## B. Past persecution

We turn now to the BIA's alternative conclusion that the Maoists' actions were not sufficiently severe to rise to the level of past persecution. Because the BIA relied on the IJ's more complete analysis on this issue, we look to the IJ's opinion to determine the basis for the agency's decision. The IJ first considered the August 2007 attack on Petitioner. After noting that Petitioner was released from the hospital after one or two hours and suffered no permanent injury, the IJ concluded that this physical assault was not sufficiently severe to qualify as persecution. The IJ then considered the November

2004 car bombing that killed five of Petitioner's colleagues. The IJ concluded this bombing could not be considered persecution of Petitioner because he "did not personally suffer anything from this attack." (R. at 56.) The IJ thus disregarded this evidence in determining whether the Maoists' actions rose to the level of persecution.

The IJ erred in relying on the absence of permanent physical harm to find that Petitioner was not persecuted by the Maoists. Nothing in the pertinent statutes or relevant precedents suggests that an applicant must be permanently maimed in order to demonstrate past persecution. The record shows that the beating Petitioner suffered resulted in injuries serious enough to require medical care, with the hospital documents indicating that Petitioner was rendered semi-unconscious in the attack. Regardless of whether Petitioner was permanently injured in this attack, it does not seem to be a minor incident that can be brushed off as insignificant. *Cf. Witjaksono v. Holder*, 573 F.3d 968, 977 (10th Cir. 2009) (holding that physical assaults did not rise to the level of persecution where they did not "requir[e] medical attention"). Additionally, Petitioner presented both testimony and a corroborating newspaper report to prove that he was the intended target of the lethal car bombing. The fact that he survived this attempt on his life due to a last-minute change in his travel plans does not prevent him from relying on this incident to prove he was persecuted by the Maoists. We agree with the Eleventh Circuit that "an attack can be 'physical' and constitute a form of persecution even if the intended target of the attack is not actually struck by the attacker's projectile." *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257 n.7 (11th Cir. 2007); *see also Begzatowski v. INS*, 278 F.3d 665, 670 (7th

-21-

Cir. 2002) ("[W]e previously have rejected attempts by the BIA to impose on asylum applicants the additional burden of establishing permanent or serious injuries as a result of their persecution."). "Put simply, attempted murder is persecution." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1233 (11th Cir. 2007). The IJ erred in disregarding the attempt on Petitioner's life as evidence of past persecution and in minimizing the import of the physical assault he suffered.

The IJ and BIA also failed to consider other supporting evidence, such as Petitioner's testimony that the Maoists seized his rice field. "Confiscation of property has been cited as one type of action that can cross the line from harassment to persecution." *Ouda v. INS*, 324 F.3d 445, 454 (6th Cir. 2003). Moreover, the BIA and IJ appear not to have considered evidence of the threats Petitioner received both before and after he was targeted in a lethal bombing and physically assaulted. While threats alone are insufficient to constitute persecution, threats should be considered in assessing the cumulative impact of all of the mistreatment a petitioner suffered. *Mejia*, 498 F.3d at 1257. "We do not look at each incident in isolation, but instead consider them collectively, because the cumulative effects of multiple incidents may constitute persecution." *Ritonga*, 633 F.3d at 975. In this case, we conclude the record compels the conclusion that Petitioner suffered past persecution, giving rise to a rebuttable presumption of a well-founded fear of future persecution.[1]

_____

[1] As noted above, a well-founded fear of future persecution is not required when the level of past persecution is sufficiently severe. *See Krastev*, 292 F.3d at 1270-71. On

## C. *Well-founded fear of future persecution*

The BIA concluded that Petitioner had not demonstrated a well-founded fear of future persecution because he had not shown past persecution and because his father's willingness to return to Nepal negated the reasonableness of his asserted fear of returning to Nepal. As previously noted, the agency failed to consider significant relevant evidence in assessing whether Petitioner faced past persecution. Moreover, the agency's reliance on Petitioner's father's testimony completely fails to consider the explanations given by Petitioner and his father as to why Petitioner's father, unlike Petitioner, was willing to return to Nepal. Petitioner's father did not state that it was safe for him to return to Nepal—he simply expressed the fatalistic view that he did not mind returning to Nepal because he was old and ready to die. This testimony cannot reasonably be taken to support the view that Petitioner's fear of returning to Nepal was unfounded.

The agency's decision to deny Petitioner's claims for asylum and restriction on removal cannot be upheld on any of the grounds given by the BIA. We accordingly grant the petition for review as to these claims. On remand, the agency should determine (1) whether Petitioner's past persecution was sufficiently severe that he did not need to demonstrate a well-founded fear of future persecution, and, if not, (2) whether changed

_____

appeal, the parties do not address whether the past persecution in this case would rise to that level of severity. Because we hold that the BIA erred in concluding that Petitioner had not shown a well-founded fear of future persecution, we do not address whether the level of past persecution was sufficiently severe to make Petitioner eligible for asylum on this ground as well.

-23-

country conditions or the possibility of internal relocation are sufficient to rebut the presumption that he has a well-founded fear of future persecution. *See Krastev*, 292 F.3d at 1270-71.

## D. Convention Against Torture

Petitioner also seeks review of the BIA's denial of his CAT claim. "Article 3 of the Convention Against Torture prohibits the return of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005) (internal quotation marks and brackets omitted). "'Acquiescence of a public official requires that the public official, prior to the activity constituting the torture, have awareness of such activity and thereafter breach his or her legal responsibility to prevent such activity.'" *Id.* (quoting 8 C.F.R. § 1208.18(a)(7)). This standard does not require "actual knowledge, or willful acceptance" by the government. *Id.* (internal quotation marks omitted). "Rather, willful blindness suffices to prove acquiescence." *Id.* (internal quotation marks and brackets omitted).

The IJ and BIA concluded that Petitioner was not entitled to relief under the CAT because he had not demonstrated that government officials would be likely to acquiesce in his torture upon his return to Nepal. Petitioner argues that the agency's analysis was flawed because the IJ and BIA failed to consider relevant record evidence, particularly a key State Department report. According to that report, the Maoists won a plurality of seats in the 2008 elections, installed a Maoist prime minister, and proclaimed Nepal a

federal democratic republic. The report indicates that "Maoists frequently employed arbitrary and unlawful use of lethal force, including torture and abduction." (R. at 176.) Furthermore, "[d]uring [2008] Maoists committed 141 acts of torture, according to [the Center for Victims of Torture, Advocacy Forum–Nepal]. The government failed to conduct thorough and independent investigations of reports of security force or Maoist/[Maoist-affiliated Youth Communist League] brutality and generally did not take significant disciplinary action against those involved." (R. at 179). Petitioner argues that he is likely to be a victim of Maoist torture if he returns to Nepal. The Maoists have shown continued interest in him, regularly asking his wife and father about his location and issuing threats against him. Moreover, Petitioner argues, he has been placed on the Maoists' black list, which makes him likely to be killed or maimed by the Maoists if he returns to Nepal.

In its answer brief, the government argues there is no evidence that the Nepali government has enough information about Petitioner's situation to be willfully blind to any possible torture, since Petitioner admitted he did not inform government authorities of his fear of harm from the Maoists. However, this argument essentially transforms the willful blindness standard into an actual knowledge requirement. Petitioner presented evidence that the government is aware of and does not prevent the Maoists' frequent acts of torture. Petitioner does not need to present evidence that the government knows of the specific threat against him in order to show that the government would likely turn a blind eye to his torture if he returned to Nepal. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1196

-25-

(9th Cir. 2003) ("The correct inquiry as intended by the Senate is whether a respondent can show that public officials demonstrate 'willful blindness' to the torture of their citizens by third parties, or as stated by the Fifth Circuit, whether public officials 'would turn a blind eye to torture.'" (quoting *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 355 (5th Cir. 2002))). The case the government cites for support, *Cruz-Funez v. Gonzales*, 406 F.3d 1187 (10th Cir. 2005), is distinguishable. There, the petitioners faced a threat from a particular individual, and there was no evidence that public officials were aware of or had acquiesced in any previous acts of torture by this individual or his employees. *See id.* at 1192. Under those circumstances, the fact that the petitioners had not informed the government of the individual's threats against them prevented the conclusion that the government would acquiesce in whatever actions the individual took against them. *Id.* Here, on the other hand, Petitioner's evidence that the government regularly fails to take action to prevent or punish Maoist acts of torture makes this a very different case.

The record as a whole simply does not support the BIA's conclusion that Petitioner failed to show that public officials in Nepal would likely acquiesce in his torture by the Maoists if he returns to Nepal. We accordingly grant the petition for review as to Petitioner's CAT claim as well. However, we note that there has been no agency fact-finding on the likelihood that Petitioner will be tortured if he returns to Nepal, and on remand the agency may consider whether Petitioner has shown a sufficient likelihood of torture to be entitled to CAT relief.

### III. CONCLUSION

For the foregoing reasons, we **GRANT** the petition for review, **VACATE** the BIA's affirmance of the immigration judge's order, and **REMAND** for further proceedings in accordance with this opinion.