FILED
United States Court of Appeals
Tenth Circuit

August 24, 2022

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DIOGENES JASSO BERNAL,

    Petitioner,

v.

MERRICK B. GARLAND,
United States Attorney General,

    Respondent.

No. 21-9558
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **HOLMES** and **ROSSMAN**, Circuit Judges.
_____

Diogenes Jasso Bernal, a native and citizen of Mexico, petitions for review of

the Board of Immigration Appeals (BIA) decision that dismissed his appeal from the

denial of his application for deferral of removal under the Convention Against

Torture (CAT). The BIA determined that Mr. Bernal failed to show it is more likely

than not that he would be tortured by the Jalisco New Generation Cartel (JNGC)

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

upon his return to Mexico with the acquiescence of Mexican authorities.  Exercising jurisdiction under 8 U.S.C. § 1252(a)(4), we deny the petition.

## I.  BACKGROUND

Mr. Bernal has been entering the United States unlawfully on and off since 1982, when he first arrived as a teenager.  In 1996, he was convicted of second-degree robbery in California.  Upon completion of his prison sentence in 1998, Mr. Bernal was deported to Mexico.  In 2000, he was apprehended while trying to reenter the United States and convicted of illegal reentry.  After serving four years in prison, in 2004, Mr. Bernal was deported to Mexico.  In 2012, he attempted to reenter the United States and was again convicted of illegal reentry.  After serving four years in prison, he was released and deported to Mexico in 2016.  Mr. Bernal's most recent unlawful reentry was later in 2016, when he was once again apprehended while trying to reenter the United States.

Mr. Bernal represented himself at his first merits hearing, which took place in California in 2017.  He testified that when he was deported to Mexico in 2004, he settled in Sayulita.  Sometime in 2007 or 2008, he got into a dispute with a neighbor, whose wife had a brother who was a member of the JNGC.  She told her brother—Mario Guerrero—that Mr. Bernal had threatened the family with a gun and abused either Guerrero's son or nephew. [1]

---

[1] Whether the alleged abuse was perpetrated against Guerrero's son or nephew is just one of many discrepancies between Mr. Bernal's testimony and his written declaration.  None of these discrepancies, however, are material to our resolution of this appeal.

Several days later, Mr. Bernal heard people who he believed were linked to Guerrero walking outside his residence and he ran away towards a river. When he jumped into the river, the people started shouting and "somebody fired a shot. I think it was up in the air and not at me." Admin. R., vol. 3 at 1948. Shortly thereafter, he encountered a police officer and when he told him what happened, the officer informed him that Guerrero was a JNGC leader and that he should leave the area.

The next day, Mr. Bernal left for Puerto Vallarta where he lived for several months. One day when he was riding in a taxi, two men got out of a truck and approached the taxi. When the taxi driver got out of the vehicle and ran away, Mr. Bernal got into the driver's seat and drove off into oncoming traffic. He eventually stopped when he saw a police car. He intended to tell the police that he was being followed by some men, but before he could explain himself, the police accused him of being involved with a drug cartel and stealing the taxi. They put him in handcuffs and beat him before taking him to jail, where the beating continued. After he was placed in a cell, Mr. Bernal told his cellmate what happened. The cellmate told him that the JNGC controlled several of the units in the jail, including the unit where he was housed. When Mr. Bernal informed the prison officials that he was being pursued by the JNGC, they moved him to a unit where he would be safe. When Mr. Bernal heard that Guerrero was offering money to people to stab him, the warden moved him again—this time to the medical unit—and advised him to leave the area once he was released.

After his release, Mr. Bernal moved to Cabo San Lucas where he found work selling timeshares. Several months later, his supervisor warned him to leave because some people who knew about the incident with his neighbor in Sayulita were looking for him. The supervisor told him he could get him a job in Cancun and drove him to the airport. Several months after he moved to Cancun, Mr. Bernal overheard some people say that they were going to cut off his head for abusing Guerrero's son.

Mr. Bernal then moved to Mexico City and found a job at a flea market. One day, two people began following him and he went to the police station for help. "I stayed the whole night there. In the morning I called and spoke with the public ministry and I made a report. . . . [The official] said . . . it's a very big cartel[,]" and urged him to move to the United States. *Id.* at 1977. While Mr. Bernal was waiting for a bus to take him to Juarez, someone got out of a car with a gun. As Mr. Bernal began to run away, he heard a gunshot. "I don't know if he shot at me. I think he just shot so that I would stop." *Id.* But he kept running until he encountered the federal police, who helped him prepare an affidavit regarding the incident. They also advised him to move to the United States because they could not protect him. Acting on their advice, Mr. Bernal reentered the United States in 2012. In 2016, after serving a four-year prison sentence for his resulting illegal reentry conviction, he was deported for a third time to Mexico.

Upon his return to Mexico, Mr. Bernal settled in Monterrey. One day at a metro station he overheard someone say: "I have him. . . . [D]o I shoot him?" *Id.* at 1982. The caller pulled out a gun and Mr. Bernal heard a gunshot. He jumped

4

onto the rails and made his way to the other side of the tracks. When the police arrived, he told them what happened and that he did not have anywhere to go or any money. The police took Mr. Bernal to jail so he could rest and call his family for help. While in jail, other prisoners told him that Guerrero had given orders to kidnap and torture him and post it on YouTube. According to Mr. Bernal, when he refused to leave the jail, an officer threatened to shoot him and called someone to ask whether he should shoot him or keep him there for someone to pick him up. Mr. Bernal left the jail and eventually encountered a police officer who in turn called a judge for advice. The judge spoke to Mr. Bernal and told him to return to the jail for another night. The next day, the same judge hid Mr. Bernal on the floor of his truck and drove him to a metro station.

Eventually, Mr. Bernal made his way to Chetumal, where he made a police report. The official who took the report told him that the JNGC operated throughout Mexico and that he should leave. He went to Tijuana and crossed the border into the United States, where he was apprehended and placed in removal proceedings.

## II. AGENCY PROCEEDINGS

Following the first merits hearing, the immigration judge (IJ) found that Mr. Bernal was credible but concluded that he was not eligible for asylum or withholding of removal, including withholding of removal under the CAT. The IJ further found that Mr. Bernal was not entitled to deferral of removal under the CAT because he failed to show it is more likely than not that he would be subject to torture with the consent or acquiescence of the Mexican government. The BIA affirmed.

Mr. Bernal appealed pro se. The Ninth Circuit Court of Appeals appointed pro bono counsel to represent him and granted his petition for review on the ground that the IJ had not adequately assessed his competency to represent himself. While his appeal was pending, Mr. Bernal was transferred to a detention facility in Aurora, Colorado; thus, on remand the case was transferred to an immigration court in Aurora. Based on the results of a subsequent competency evaluation, the IJ found that Mr. Bernal was not competent to represent himself and pro bono counsel continued to represent Mr. Bernal.

At the outset of the second merits hearing in 2021, the IJ determined, and Mr. Bernal agreed, that there was no need to repeat his previous testimony, and the hearing would be limited to providing additional facts that had not already been provided or fully developed. As new facts, Mr. Bernal testified that the JNGC would be able to recognize him because his last name was tattooed on his neck and some letters were tattooed on his stomach. He further said that some of his half-siblings' relatives living in Mexico had been killed, although he did not know why. He also submitted several declarations, including a declaration from his sister in which she stated that during a 2019 visit with their cousin who lives in Tijuana, he told her that Mr. Bernal should stay away. And Mr. Bernal's half-brother, who also lives in Tijuana, wrote that in 2020, cartel members were "looking for [Mr. Bernal] around my neighborhood and making inquiries into his whereabouts." *Id.*, vol. 1 at 432. He added that the cartel "will kill [Mr. Bernal] if they find him, just as they killed my brother." *Id.*

6

The IJ adopted the prior IJ's favorable credibility finding at the first hearing and further found that Mr. Bernal testified credibly at the second hearing. The IJ reaffirmed that Mr. Bernal was ineligible for asylum and any form of withholding of removalbased on his robbery conviction. Alternatively, the IJ found that he was not entitled to either withholding or deferral of removal under the CAT—because he failed to show it is more likely than not that he would be tortured in Mexico with the consent or acquiescence of Mexican officials.

The BIA dismissed Mr. Bernal's appeal from the IJ's decision that denied CAT relief. It agreed with the IJ that Mr. Bernal was not entitled to deferral because he "has not met his burden of demonstrating that he will more likely than not be subjected to torture in the future at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* at 4. And because the standard for establishing entitlement to CAT withholding and deferral is the same, the BIA found it unnecessary to address whether Mr. Bernal's robbery conviction was a particularly serious crime that foreclosed withholding under the CAT. *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1) (CAT withholding of removal), *id.* § 1208.17(a) (CAT deferral of removal).

On appeal, Mr. Bernal challenges only the BIA's denial of deferral of removal under the CAT.[2]

---

[2] In an effort at completeness, however, we note that Mr. Bernal expressly "reserve[d] the right to present his claim for withholding of removal to the BIA," "[i]f the Court vacates the removal order and remands to the BIA." Pet'r's Opening Br. at 4, n. 1.

### III.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review both factual and legal challenges to the BIA's denial of relief under the CAT.  *Nasrallah v. Barr*, 140 S. Ct. 1683, 1690-91 (2020) (holding that the prohibition on reviewing factual challenges to final orders of removal under 8 U.S.C. § 1252(a)(2)(c) does not apply to CAT orders).

Because a single member of the BIA issued the order affirming the IJ's decision, we review "both the decision of the BIA and any parts of the IJ's decision relied on by the BIA in reaching its conclusion."  *Razkane v. Holder*, 562 F.3d 1283, 1287 (10th Cir. 2009); *see also Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006) (explaining that when the BIA's decision provides "a condensed version" of the IJ's reasons for the decision, we may consult the IJ's "more complete discussion" to "give substance to the BIA's reasoning").

We review legal determinations do novo, *see Igiebor v. Barr*, 981 F.3d 1123, 1131 (10th Cir. 2020), and the BIA's factual findings under the deferential substantial-evidence standard, *see Nasrallah*, 140 S. Ct. at 1692 ("Although a noncitizen may obtain judicial review of factual challenges to CAT orders, that review is highly deferential.").  Under the substantial-evidence standard, the agency's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  We must affirm the agency's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Yuk v. Ashcroft*, 355 F.3d 1222, 1233 (10th Cir. 2004) (internal quotation marks omitted); *see also Htun v. Lynch*, 818 F.3d

8

1111, 1119 (10th Cir. 2016) ("[E]ven if we disagree with the BIA's [findings], we will not reverse if they are supported by substantial evidence and are substantially reasonable." (internal quotation marks omitted)).

## IV.  LEGAL FRAMEWORK

Aliens like Mr. Bernal who are ineligible for withholding of removal under either the Immigration and Nationality Act or the CAT may still be eligible for deferral of removal under the CAT.  8 C.F.R. §§ 1208.16(c)(4), 1208.17(a).  To establish eligibility for deferral, an alien must prove "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." § 1208.16(c)(2).  "Torture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person."  8 C.F.R. § 1208.18(a)(1). It "is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."  *Id.* § 1208.18(a)(2). "In order to constitute torture, mental pain or suffering must be prolonged mental harm caused by or resulting from . . . [t]he intentional infliction or threatened infliction of severe physical pain or suffering [or] [t]he threat of imminent death."  *Id.* § 1208.18(a)(4).

In assessing the likelihood of torture, the factfinder must consider "all evidence relevant to the possibility of future torture . . . including, but not limited to evidence of past torture"; the applicant's ability to relocate "to a part of the country of removal where he or she is not likely to be tortured"; "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal"; and

9

"[o]ther relevant information regarding conditions in the country of removal." *Id.* § 1208.16(c)(3)(i)-(iv). To meet the burden of proof, an applicant must demonstrate he is personally at risk of torture. *See In re J-E-*, 23 I. & N. Dec. 291, 303 (B.I.A. 2002) (en banc) ("The United Nations Committee Against Torture has consistently held that the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute sufficient grounds for determining that a particular person would be in danger of being subjected to torture upon his return to that country." Instead, "[s]pecific grounds must exist that indicate the individual would be personally at risk." (footnote omitted)), *overruled on other grounds by Azanor v. Ashcroft*, 364 F.3d 1013 (9th Cir. 2004).

Moreover, for "severe pain or suffering" to warrant deferral of removal under the CAT, it must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7). "This standard does not require actual knowledge, or willful acceptance by the government. Rather, willful blindness suffices to prove acquiescence." *Karki v. Holder*, 715 F.3d 792, 806 (10th Cir. 2013) (citation and internal quotation marks omitted). However, evidence of police corruption or their inability to prevent torture does not compel a finding of acquiescence. *See, e.g., Ferry v. Gonzales*, 457 F.3d 1117, 1131 (10th Cir. 2006)

10

(petitioner failed to show acquiescence where the record showed the government had made efforts to prevent potential torture); *see also Cruz-Funez v. Gonzales*, 406 F.3d 1187, 1192 (10th Cir. 2005) (evidence of government corruption and underfunding of police did not compel a conclusion of government acquiescence).

## V.  ANALYSIS

Mr. Bernal maintains that the BIA applied the wrong legal standards in analyzing his application for deferral of removal under the CAT and that the case must be remanded for further consideration.  Alternatively, he argues that even if there was no legal error, any reasonable adjudicator would be compelled to conclude that Mr. Bernal will likely be tortured with the acquiescence of the Mexican authorities.  We disagree on both counts.

### A.  Torture

As to the likelihood of torture, the IJ considered three factors:  (1) whether there was past torture; (2) the passage of time since the first incident in 2008; and (3) country conditions in Mexico.[3]  Regarding the first factor, Mr. Bernal maintains that the BIA erred as a matter of law when it failed to consider whether he suffered past mental torture.  The record, however, does not support this contention.  The BIA

---

[3] Mr. Bernal maintains that the IJ was also required to consider whether he could relocate to avoid torture.  We agree with the BIA that the IJ was not required to reach the issue because it was unnecessary to the result.  *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach."); *Griffin v. Davies*, 929 F.2d 550, 554 (10th Cir. 1991) ("We will not undertake to decide issues that do not affect the outcome of a dispute.").

11

specifically considered whether there was past mental torture and found none. "[Mr. Bernal] acknowledged that he suffered no physical harm during the incidents when he was targeted by the [JNGC], but argues that he endured *significant mental suffering*. . . . While these incidents were naturally frightening, we agree with the [IJ] that they do not amount to past torture." Admin. R., vol. 1 at 4 (emphasis added). There was no legal error.

Next, Mr. Bernal contends that the agency's finding that the JNGC is no longer motivated to harm him more than a decade after the 2008 incident is not supported by substantial evidence. To counter this finding, he points to his own testimony that the JNGC pursued him until he left the country in 2016, and his half-brother's declaration, which stated that unknown members of an unknown cartel were looking for Mr. Bernal as recently as 2020. But as the BIA explained, the IJ properly afforded limited weight to the half-brother's declaration. *See Matter of H-L-H- & Z-Y-Z-*, 25 I. & N. Dec. 209, 215 (B.I.A. 2010) (letters from friends and family are given diminished weight because they are from interested witnesses not subject to cross examination).

Last, Mr. Bernal asserts that the agency failed to properly consider the evidence of human rights violations and country conditions to determine whether he was at personal risk of torture. In particular, he points to record evidence that the JNGC is associated with extreme violence, including beheadings, public hangings, and acid baths, and often posts images of these activities on social media. Additionally, he cites the JNGC's ability to track him through social media, which

allows its members to share the names and photographs of its targets. According to Mr. Bernal, this "well-documented campaign of cartel violence throughout the country, which in recent years has been led by the [JNGC]," establishes "[t]he likelihood that [he] will be tortured in Mexico." Pet'r's Opening Br. at 28-29.

The IJ acknowledged that the JNGC "has been associated with extreme violence," and Mexico's "human rights issues include reports of . . . involvement by police, military, and other government officials and illegal armed groups in unlawful or arbitrary killings, forced disappearance and torture." Admin. R., vol. 1 at 60 (internal quotation marks omitted). Nonetheless, the IJ found that "the record lacks sufficient evidence to establish that [Mr. Bernal] is at personal risk of torture if returned to Mexico. . . . As a result, he has not shown that it is more likely than not that he *specifically* would be subjected to torture upon his removal to Mexico." *Id.* (citing *Escobar-Hernandez v. Barr*, 940 F.3d 1358, 1362 (10th Cir. 2019) (noting that "by itself, pervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there")).

Mr. Bernal, however, criticizes the IJ's reliance on cases holding that pervasive violence is generally insufficient to demonstrate a personal risk of torture because "such evidence is by its nature generalized and not indicative of personal risk to the applicant." Pet'r's Opening Br. at 30 (internal quotation marks omitted). We disagree because this line of cases recognize that "by itself, pervasive violence" is "*generally*"—but not always—insufficient to demonstrate the likelihood of an

13

*individual* applicant's torture.  *See, e.g., Escobar-Hernandez*, 940 F.3d at 1326 (emphasis added).  More to the point, the agency did not rely solely on country conditions in finding that Mr. Bernal did not establish a personal risk of torture; rather, the BIA found that

> [t]he [IJ] considered *both the . . . individualized evidence and the country conditions evidence*, and did not clearly err in finding that [Mr. Bernal] does not have a clear probability of being tortured by the cartel, *particularly when the cartel's interest in him is based on events that occurred more than a decade ago.*

Admin. R., vol. 1 at 4 (emphasis added).

Nonetheless, we do not decide whether the agency's finding that Mr. Bernal would not likely be tortured on his return to Mexico is supported by substantial evidence; instead, we affirm because the agency's finding that any such torture would not occur with the acquiescence of the Mexican authorities is supported by reasonable, substantial, and probative evidence, and no reasonable adjudicator would be compelled to conclude otherwise.

**B.  Acquiescence**

In reaching its determination that Mr. Bernal did not satisfy his burden to show that the Mexican authorities would acquiesce in his torture, the BIA "agree[d] with the [IJ] that [he] has not established that a public official would likely turn a blind eye to the cartel members torturing [him]" because "the police have on a number [of] occasions protected [him] from the cartel." *Id.* at 5.  The BIA further concluded that "the presence of widespread corruption and the government's general inability to protect all of its citizen[s] from the Mexican cartels' violence [is] not enough to

14

establish likely acquiescence by a public official, particularly when the record . . .

contains evidence of the Mexican government making a concerted effort to

crackdown against corruption and local officials' efforts to protect citizens from

cartel violence." *Id.* According to Mr. Bernal, however, these determinations are

riddled with legal error and not supported by substantial evidence.

We disagree.

Mr. Bernal first maintains that the BIA committed legal error when it failed to

consider whether the government efforts to protect him "would prove successful."

Pet'r's Opening Br. at 34. But "willful blindness" to torture—not success in

preventing it—is the standard for acquiescence in this circuit. *See Karki*, 715 F.3d at

806. Thus, we do not require evidence that policing efforts are successful to

conclude that a government would not be willfully blind to criminal activity that

might constitute torture. *See Ferry*, 457 F.3d at 1131; *Cruz-Funez*, 406 F.3d at 1192.

Moreover, we disagree with Mr. Bernal's attempt to cast the warnings he received

from law enforcement to leave the country as acquiescence. It is one thing to turn a

blind eye to torture and another to help a potential victim avoid torture, even if it

means advising them to leave the country.

In apparent recognition that success is not the standard, Mr. Bernal asserts that

the "BIA can[not] *ignore* evidence indicating that efforts to protect an applicant will

*not* be successful." Pet'r's Opening Br. at 35. But the BIA did not ignore this

evidence; instead, it concluded that the government's general inability to protect

against cartel violence was insufficient to establish likely acquiescence in Mr.

15

Bernal's torture given the evidence that the government is "making a concerted effort" to combat corruption and that local officials try to protect individual citizens from such violence.  Admin. R., vol. 1 at 5.

Further, Mr. Bernal acknowledges that "a government does not acquiesce in torture merely because it is aware of torture but powerless to stop it."  *See* Pet'r's Opening Br. at 36 (internal quotation marks omitted).  In doing so, he attempts to distinguish cases where the police "attempted to apprehend and prosecute [the applicant's] torturers and [were] simply unable to do so, either for lack of information or lack of resources," from his case, where he maintains that the police made no effort whatsoever to apprehend the suspected torturers.  *Id.*  But there is no evidence to support an argument that the police breached its duty to intervene; instead, it had no information to act on.  For example, there is no evidence that Mr. Bernal provided police with the names or physical descriptions of his would-be torturers who pursued him throughout Mexico.  Nor was there any evidence that the police refused to take a report from Mr. Bernal or listen to his concerns.  Moreover, the evidence does not compel a finding that "the Mexican Government's inability to protect [Mr. Bernal] is related to widespread corruption and a campaign of intimidation."  *Id.*  To be sure, the record contains some evidence of corruption of government officials and their involvement in the criminal activities of cartels— mainly drug trafficking.  But this evidence does not compel a finding of government acquiescence, particularly in light of the assistance that Mr. Bernal repeatedly received from law enforcement.  The agency's finding that Mr. Bernal did not

16

establish that Mexican authorities would acquiesce in his torture is supported by substantial evidence and must be affirmed.

## VI.  CONCLUSION

The petition for review is denied.

Entered for the Court


Timothy M. Tymkovich
Chief Judge