FILED
United States Court of Appeals
Tenth Circuit

August 26, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

O.C.V.; M.C.R.M.; O.T.C.R.; L.C.R.,

    Petitioners,

v.                                                                  No. 23-9609

PAMELA J. BONDI, United States
Attorney General,*

    Respondent.

-----------------------------

THE ROUNDTABLE OF FORMER
IMMIGRATION JUDGES; CAPITAL
AREA IMMIGRANTS' RIGHTS
COALITION,

    Amici Curiae.

_____

**Petition for Review from the Board of Immigration Appeals**

_____

Anne Dutton of Center for Gender & Refugee Studies, San Francisco, California (Anne Peterson, Center for Gender & Refugee Studies, San Francisco, California, and Victoria Neilson, National Immigration Project, Washington, DC, with her on the briefs), for Petitioners.

---

\* On February 5, 2025, Pamela J. Bondi became Attorney General of the United States. Consequently, she has been substituted for Merrick B. Garland as Respondent, per Fed. R. App. P. 43(c)(2).

Sarah K. Pergolizzi, Senior Litigation Counsel (Holly M. Smith, Assistant Director, with her on the brief) of Office of Immigration Litigation, U.S. Department of Justice, Washington, DC, for Respondent.

Erik Kundu and Rebecca Human of Perkins Coie LLP of Seattle, Washington filed an *Amicus Curiae* brief for The Roundtable of Former Immigration Judges.

Peter Cameron Alfredson and Amelia Christine Dagen of Capital Area Immigrants' Rights Coalition of Washington, DC filed an *Amicus Curiae* brief for Capital Area Immigrants' Rights Coalition.

_____

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

Petitioners, all members of the same family, are natives and citizens of Mexico. They fled their home country to escape a criminal cartel. Upon arriving in the United States, they applied for asylum and withholding of removal. An immigration judge (IJ) denied relief, and the Board of Immigration Appeals (BIA) dismissed the appeal. Petitioners now seek this court's review of that BIA order. We agree with Petitioners that the BIA stated an erroneous standard for determining whether family membership "was or will be at least one central reason for" persecution under the Immigration and Nationality Act (INA). 8 U.S.C. § 1158(b)(1)(B)(i). Exercising jurisdiction under 8 U.S.C. § 1252(a)(1), we therefore grant the petition for review, vacate the BIA order, and remand to the BIA for further proceedings consistent with this opinion.

2

**I**[1]

**A**

Petitioners call themselves "the C.R. family."[2] Members of the C.R. family include:

- <u>M.R.M.S.</u>, the C.R. family's matriarch, who passed away before this petition for review was filed;

- <u>M.C.R.M.</u>, M.R.M.S.'s daughter;

- <u>O.C.V.</u>, M.C.R.M.'s partner; and

- <u>Several children</u> M.C.R.M. and O.C.V. had together and with other people, including M.C.R.M.'s son V.R.R.M.

The C.R. family lived in a home on an 86-hectare (212-acre) parcel of farmland in Madera, Chihuahua, Mexico. M.C.R.M. and O.C.V. had long lived or worked on that land.

---

[1] We take the facts from the BIA order on review and, because that order's factual recitation is sparse, the underlying IJ order, the petitioners' credible testimony, *see* R.77 (the IJ finding the testifying respondents credible); R.34 (the government accepting that conclusion), and other unchallenged parts of the record. As we will explain, we have authority to *review* only the BIA decision in this case. *See Uanreroro* v. *Gonzales*, 443 F.3d 1197, 1203 (10th Cir. 2006). But nothing prevents us from looking to other parts of the record, like the IJ order, *for our factual recitation*, as that does not constitute *reviewing* anything else.

[2] This court provisionally granted the C.R. family's motion to refer to the petitioners using only initials, subject to reconsideration by this panel. We do not disturb that decision and therefore refer to the petitioners using their initials. We refer to the family in this opinion as the C.R. family or Petitioners.

3

Trouble began for the C.R. family around October 2017. That month, V.R.R.M. stopped for gas when trucks surrounded him and the group he was with. Men stepped out of a truck, kidnapped V.R.R.M., and threatened the others. Five days later, someone informed M.C.R.M. that her son V.R.R.M. was found dead, left in a field outside of town after being shot in the head.

After the murder, M.C.R.M. and O.C.V. received calls and text messages from the cartel "La Linea," from V.R.R.M.'s phone. The caller asked whether M.C.R.M. was V.R.R.M.'s mother, using her son's nickname. M.C.R.M. recounts, "The man then yelled at me demanding that . . . my family and I needed to leave our home and leave town." R.173–74. A caller also referred to O.C.V. as "the Devil." R.182. The text messages reinforced the threats made by phone. For example, one message read, "Already took one we're coming for the rest," and another said, "If you don't leave we'll come for the rest." R.174, 182.

M.C.R.M. and O.C.V. got new mobile phones and new numbers, but that did not stop the threats. More than ten armed members of La Linea then visited the C.R. family at their home. They demanded the C.R. family abandon the home and leave Madera, then pointed their weapons at the family members and warned, if they did not comply, the cartel would "make sure" they were "gone." R.174. M.C.R.M. took that to mean either "we leave or they will kill us." R.174.

The C.R. family then left Madera for Juarez. On the way, Petitioners stopped to eat in a different town. M.C.R.M. had noticed a dark Escalade following them, and it stopped at the same food stand as the C.R. family. One of the men in the vehicle stepped out, approached M.C.R.M., and showed her a photo of V.R.R.M. on what might have been V.R.R.M.'s phone. Petitioners left quickly and did not stop again before reaching Juarez.

M.C.R.M. thought her family might be safe in Juarez. But instead, she received a call on her new phone, this time insisting the C.R. family leave Mexico altogether, threatening them with death if they did not comply. This last caller said he was trying to stop the C.R. family from returning to reclaim the parcel of land in Madera they had abandoned. Evidence submitted in immigration proceedings revealed La Linea has driven others off their lands near the C.R. family's parcel.

**B**

**1**

In November 2017, the C.R. family arrived in the United States without valid entry documents. The Department of Homeland Security (DHS) charged each family member as removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I). The IJ consolidated their cases so Petitioners' claims would be considered together.

In March 2018, the IJ held the first consolidated hearing, where, through counsel, the C.R. family conceded each family member was removable.

5

Petitioners then submitted asylum and withholding-of-removal applications under 8 U.S.C. §§ 1158(b)(1)(A) and 1231(b)(3)(A) for each adult family member.[3] As relevant to this appeal, both surviving adults' applications sought asylum and withholding of removal based on political opinion and membership in a particular social group (PSG). *See id.* § 1158(b)(1)(A) (for asylum, requiring the applicant to be "a refugee"); *id.* § 1101(a)(42)(A) (defining "refugee" to require past or future "persecution *on account of* race, religion, nationality, *membership in a particular social group*, or *political opinion*" (emphasis added)); *id.* § 1231(b)(3)(A) (for withholding of removal, similarly requiring "that the [applicant's] life or freedom would be threatened . . . *because of* the [applicant's] race, religion, nationality, *membership in a particular social group*, or *political opinion*"). In a pre-hearing statement summarizing its arguments, the C.R. family's counsel asserted three PSGs:

---

[3] The adult family members—M.R.M.S., M.C.R.M., and O.C.V.—filed separate applications. The two then-minor petitioners, O.T.C.R. and L.C.R., are listed as derivative beneficiaries on surviving adults' applications, meaning their eligibility for asylum turns entirely on those applications. *See* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 1208.21(a) (2024).

The C.R. family also initially applied for relief under the Convention Against Torture. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 113. But the BIA found they had abandoned that claim, and the C.R. family does not challenge that finding. We therefore do not consider that form of relief.

"1. 'Landowners in Madera, Chihuahua, Mexico'

2. 'Heirs to land in Madera, Chihuahua, Mexico'

3. 'Members of the [C.R.], and perceived members of the [C.R.] household, in Madera, Chihuahua, Mexico.'" R.164.

In August 2019, the IJ held a hearing, at which O.C.V. and M.C.R.M. testified.[4] The IJ also considered record evidence, including reports and articles about conditions in Mexico and specifically in Chihuahua, evidence that V.R.R.M. had died, and affidavits from O.C.V. and M.C.R.M.

In an oral decision and order dated the same day, the IJ denied the applications and ordered the C.R. family removed to Mexico. The IJ found the testifying family members credible. The IJ then explored the four asserted bases for asylum—the three PSGs and political opinion. He found none of the PSGs was cognizable.[5] *See, e.g.*, *In re Acosta*, 19 I. & N. Dec. 211, 233 (B.I.A. 1985) (holding a PSG must comprise "a group of persons all of whom share a common, immutable characteristic"), *abrogated on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987); *Niang* v. *Gonzales*, 422 F.3d

---

[4] Neither the children nor their grandmother M.R.M.S., who had age-related memory and hearing issues, testified.

[5] As to the third asserted PSG—"Members of the [C.R.], and perceived members of the [C.R.] household, in Madera, Chihuahua, Mexico," R.164—the IJ understood the C.R. family as "clearly arguing that the family group is the [PSG]," R.78. Neither the BIA nor any party has advanced a contrary understanding of this PSG, so we interpret it the same way.

1187, 1198–1200 (2005) (granting *Chevron* deference to *Acosta*'s formulation). The IJ also found insufficient evidence of any political opinion that could support an asylum claim.

The IJ then held, even if the three asserted PSGs were cognizable, the evidence was insufficient to show the C.R. family belonged to the land-related PSGs. As to the family-based PSG, the IJ was unpersuaded "that the motivation or a central reason for the threat and the harm to the respondents was the family ties." R.80; *see* 8 U.S.C. § 1158(b)(1)(B)(i) (for asylum, requiring that "race, religion, nationality, membership in a [PSG], or political opinion was or will be at least one central reason for persecuting the applicant"). "Rather," the IJ reasoned, cartel members "were threatening everyone that inhabited the land that they wanted . . . so that . . . the cartel could control the land. The family ties do[] not appear to be a central reason for the threats of harm that the respondents fear." R.80. Consistent with applicable Tenth Circuit and BIA precedent, the IJ referred to this requirement that a protected ground be "a central reason" for persecution as "nexus." R.79–80; *see, e.g.*, *Miguel-Peña* v. *Garland*, 94 F.4th 1145, 1159 (10th Cir. 2024) (also referring to this requirement as "nexus" (quoting *Dallakoti* v. *Holder*, 619 F.3d 1264, 1267 (10th Cir. 2010))). The IJ also found no nexus to political opinion for multiple reasons.

2

The C.R. family appealed to the BIA. In that appeal, the C.R. family had winnowed down the protected grounds on which they based their claims: they focused only on the family-based PSG and abandoned the others. In a published decision, a three-judge BIA panel dismissed the appeal.

The BIA rejected the C.R. family's eligibility for relief, upholding the IJ's no-nexus finding. The BIA found that lack of nexus dispositive as to both asylum and withholding of removal. It thus reached no other issue, effectively assuming the asserted PSG was cognizable.

Before this court, Petitioners challenge several specific parts of the BIA's reasoning. We therefore summarize how the agency's reasoning proceeded here, expanding more when relevant to our analysis.

*First*, the BIA first described the nexus inquiry as centering on a persecutor's motives, requiring IJs to "make clear findings of fact" on "the reason or reasons the alleged persecutor engaged or will engage in the harmful conduct." R.4; *see* 8 U.S.C. § 1158(b)(1)(B)(i) (for asylum, requiring that a protected ground "was or will be at least one central reason for persecuting the applicant").

*Second*, recognizing persecutors can sometimes "be motivated by one or more statutory grounds," the BIA required IJs in such cases to "determine whether" one of the statutorily "protected ground[s] was or will be 'one central reason' for the harm." R.5 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)); *see* 8 U.S.C.

§§ 1101(a)(42)(A), 1158(b)(1)(B)(i) (listing viable protected grounds as "race, religion, nationality, membership in a particular social group, or political opinion"). The BIA observed "[a] protected ground that is 'incidental, tangential, superficial, or subordinate to another reason for harm' does not satisfy this standard." R.5 (quoting *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 214 (B.I.A. 2007)).

*Third*, the BIA focused on asylum claims rooted in family-based PSGs. The agency explained, "To be successful in an asylum claim based on family membership, an applicant must demonstrate that the persecutor's motive for the harm is a desire to overcome the protected characteristic of the family or otherwise based on animus against the family." R.5. The BIA continued:

> While not necessary to succeed on a family-based claim, one possible way for an applicant to establish that family status is one central reason for the claimed harm is by showing it is connected to another protected ground—such as political opinion—that is intertwined with or underlies the dispute.

R.5. The BIA contrasted cases like that with cases where "gangs, cartels, and other criminal organizations" are more centrally motivated by "more commonplace goals, including financial gain and furthering, or preventing interference in, a criminal enterprise." R.6.

*Fourth*, the BIA compared our decision in *Orellana-Recinos* v. *Garland*, 993 F.3d 851 (10th Cir. 2021), to the Fourth Circuit's decision in *Hernandez-Avalos* v. *Lynch*, 784 F.3d 944 (4th Cir. 2015). As the BIA observed, in

10

*Orellana-Recinos*, we wrote, "To the extent that the Fourth Circuit's opinion [in *Hernandez-Avalos*] holds that a gang's threats to persuade a mother to encourage, or at least allow, a son to join the gang is necessarily persecution on account of the mother's membership in the son's nuclear family, we are unpersuaded." R.7 (alterations in original) (quoting 993 F.3d at 858). After framing the two circuits' standards as incompatible, the BIA applied ours.

*Fifth*, summing up its discussion of applicable nexus law, the BIA stated the standard: "If a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm." R.7.

*Finally*, the BIA finished its opinion by applying the above-described law to the facts of this case. It found the IJ's nexus-related conclusion regarding the family-based PSG—"that the cartel was motived by a desire to control the respondents' land rather than their family membership"—was "not clearly erroneous." R.7–8. It therefore affirmed the IJ's decision and dismissed the appeal.

This timely petition for review followed.

## II

"We have general jurisdiction to review only a 'final order of removal' . . . ." *Uanreroro* v. *Gonzales*, 443 F.3d 1197, 1203 (10th Cir. 2006) (quoting 8

11

U.S.C. § 1252(a)(1)). Here, that final order is the BIA opinion. *See id.* ("[T]here is no 'final order' until the BIA acts."). Where, as here, the BIA "conduct[s] a three-member panel review" and issues "a full explanatory opinion[,] . . . the BIA opinion completely super[s]edes the IJ decision for purposes of our review." *Id.* Thus, we review *only* the BIA's opinion.[6]

Within that scope, "[w]e review the BIA's legal determinations de novo and its findings of fact for substantial evidence. 'Under a substantial evidence standard, factual findings are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Dallakoti*, 619 F.3d at 1267 (citing and quoting *Witjaksono* v. *Holder*, 573 F.3d 968, 977 (10th Cir. 2009)). As the government acknowledges, after the Supreme Court's decision in *Loper Bright Enterprises* v. *Raimondo*, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. 369, 412 (2024); *see* Resp't Jan. 10, 2025, Rule 28(j) Ltr. at 1.

---

[6] The government contends we "look[] to the IJ's decision as a 'fuller explanation' of the ground affirmed by the" BIA. Resp. Br. at 14 (quoting *Escobar-Hernandez* v. *Barr*, 940 F.3d 1358, 1360 (10th Cir. 2019)). The government is mistaken. That rule applies only when a "single BIA member [decides] the merits of the appeal by himself [via] 'a brief order, affirming, modifying or remanding' under [8 C.F.R. §] 1003.1(e)(5)." *Uanreroro*, 443 F.3d at 1204 (quoting *Cruz-Funez* v. *Gonzales*, 406 F.3d 1187, 1190 (10th Cir. 2005)); *see, e.g.*, *Escobar-Hernandez*, 940 F.3d at 1360 (applying that rule in the context of a single-judge BIA order).

## III

The C.R. family asks us to grant the petition for review on essentially three grounds. *First*, Petitioners challenge the BIA's stated nexus standard for mixed-motive asylum claims, arguing it is inconsistent with the INA. *Second*, Petitioners contend the BIA erroneously required them to show animus as part of the nexus inquiry. *Third*, Petitioners claim the BIA erroneously required them to show family membership was intertwined with another protected ground to succeed on their asylum claims. Reviewing *de novo*, *see Dallakoti*, 619 F.3d at 1267, we agree with the first challenge but not the others. We explain our reasoning in turn.

## A

We begin with the C.R. family's challenge to the following legal standard stated in the BIA opinion:

> If a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm.

R.7. According to the C.R. family, the BIA's stated nexus standard sets forth an impermissible rule that disallows what the INA specifically permits—namely, persecution can be "on account of" a protected ground, 8 U.S.C. § 1101(a)(42)(A), even where unprotected grounds also motivated the

persecutor. We agree. We first describe the applicable law on nexus and then explain why the BIA's standard misstates it.

1

The requirement to show nexus for asylum claims stems from the INA.[7] An applicant must be "a refugee within the meaning of" the statute. 8 U.S.C. § 1158(b)(1)(A). The law defines "refugee" to require, as relevant here, "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). The statute clarifies the "on account of," or nexus, requirement is met when the protected ground "was or will be at least one central reason for persecuting the applicant." *Id.* § 1158(b)(1)(B)(i).

We have recognized, "Of course, a persecutor can have multiple motives for targeting someone." *Orellana-Recinos*, 993 F.3d at 855; *see also, e.g.*, *Mazariegos-Rodas* v. *Garland*, 122 F.4th 655, 666 (6th Cir. 2024) ("Both this court and the BIA have recognized that persecutors can be motivated 'both by

---

[7] The BIA applied the same nexus standard to the C.R. family's withholding-of-removal claim. *See* 8 U.S.C. § 1231(b)(3)(A) (requiring nexus for withholding of removal). Absent any party arguing for a different approach, we do the same. *See Animal Legal Def. Fund* v. *Kelly*, 9 F.4th 1219, 1227 n.6 (10th Cir. 2021) ("[O]urs is a party-directed adversarial system and we normally limit ourselves to the arguments the parties before us choose to present." (alteration in original) (quoting *United States* v. *Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016))). But we do not decide here whether the nexus standard actually converges for those two forms of relief; given the party presentation in this case, we simply proceed under that assumption.

a protected ground and other, nonprotected grounds, such as personal pecuniary gain.'" (quoting *Skripkov* v. *Barr*, 966 F.3d 480, 487 (6th Cir. 2020)); *In re S-P-*, 21 I. & N. Dec. 486, 489 (B.I.A. 1996) ("Persecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the [INA] and others not."). In those "mixed-motive case[s]," we "join[ed] those circuits that have accepted the BIA's interpretation of § 1158(b)(1)(B)(i) set forth in" the BIA's *J-B-N-* opinion. *Dallakoti*, 619 F.3d at 1268 (citing 24 I. & N. Dec. at 214). Under that interpretation, "the protected ground cannot play a minor role in the [applicant]'s past mistreatment or fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (quoting *J-B-N-*, 24 I. & N. Dec. at 214); *accord Orellana-Recinos*, 993 F.3d at 855 (also applying this standard). An applicant can receive asylum even if the persecutor is motivated by both a protected ground (say, race) and another ground (say, financial gain), but only if the protected ground is not merely "incidental, tangential, superficial, or subordinate to" the unprotected one. The protected ground must still be a "*central* reason." 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

The BIA expanded on this standard in the context of family-based claims in *In re L-E-A-*, 27 I. & N. Dec. 40 (B.I.A. 2017).[8] There, when a man refused to

---

[8] Since the BIA originally published *L-E-A-*, the Attorney General issued a decision vacating it in part on other grounds. *In re L-E-A-* (*L-E-A- II*), 27 I. &

let a cartel sell drugs out of his store, the cartel approached the man's son and tried to enlist him to sell drugs in the store. *Id.* at 41. When the son refused, cartel members tried to kidnap him. *Id.* The son applied for asylum in the United States premised on the PSG of "his father's family members." *Id.* The BIA emphasized the persecutors in *L-E-A-* targeted the son only "because he was in a position to provide access to the store, not because of his family membership." *Id.* at 46. As the BIA elaborated,

> [N]exus is not established simply because a particular social group of family members exists and the family members experience harm. Thus, the fact that a persecutor has threatened an applicant and members of his family does not necessarily mean that the threats were motivated by family ties. . . . Further, the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground.

*Id.* at 45. Given the cartel's "objective" was "to increase its profits by selling drugs in the store," the BIA concluded "[a]ny motive to harm the respondent because he was a member of his family was, at most, incidental." *Id.* at 46. Important to this conclusion was the fact "that the cartel would have gone after any family who owned a business there." *Id.* at 47. In *Orellana-Recinos*, 993 F.3d at 856, we summarized *L-E-A-*'s central takeaway as to nexus:

---

N. Dec. 581 (A.G. 2019). But, in 2021, the Attorney General reversed course and vacated *L-E-A- II* in full. *In re L-E-A-*, 28 I. & N. Dec. 304 (A.G. 2021). Thus, the original *L-E-A-* is the applicable precedent and operates in full force today—and the parts of *L-E-A-* related to nexus, which are most relevant to this case, have always remained authoritative.

> [M]embership in a particular social group should not be considered a *motive* for persecution if the persecutors are simply pursuing their distinct objectives and a victim's membership in the group is relevant only as a means to an end—that is, the membership enables the persecutors to effectuate their objective.

*Orellana-Recinos*, 993 F.3d at 856.[9]

In evaluating nexus, "[o]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Uanreroro*, 443 F.3d at 1204 (quoting *Elzour* v. *Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004)). Under that requirement, we have overturned a BIA decision that "simply ignored . . . substantial evidence" that persecutors were motivated by an applicant's protected grounds, instead stopping its analysis after finding a motivation related to an *unprotected* ground. *Karki* v. *Holder*, 715 F.3d 792, 802 (10th Cir. 2013). That makes sense under the mixed-motives standard set out above: the existence of an unprotected motive "do[es] not negate" that protected-ground-related motives may also exist. *Id.* Thus, when evaluating nexus, "[t]he BIA is not permitted simply to ignore or misconstrue evidence [presented] in the asylum applicant's favor," including whether motives related to protected

---

[9] In *Orellana-Recinos*, the "Petitioners did not challenge" *L-E-A-*'s legal framework, instead "disput[ing] only the BIA's factual findings in their case." *Orellana-Recinos* v. *Garland*, 993 F.3d 851, 857 (10th Cir. 2021). The C.R. family similarly does not challenge *L-E-A-* in this case. *See* Op. Br. at 46 n.5.

grounds exist. *Id.* at 800 (quoting *Espinosa-Cortez* v. *Att'y Gen.*, 607 F.3d 101, 107 (3d Cir. 2010)).

## 2

Applying these principles here, we readily conclude the BIA's new rule on nexus misstates the law.

The BIA has articulated an if-then formulation: "*If* a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership *is* incidental or subordinate to that other ultimate goal *and therefore not* one central reason for the harm." R.7 (emphasis added). The BIA's new rule says an asylum applicant cannot show nexus if a motive unrelated to a protected ground exists. By contrast, the INA accommodates the understanding that—as will be often the case—a persecutor may be centrally motivated by *both* a protected ground *and* an unprotected one. *See* 8 U.S.C. § 1158(b)(1)(B)(i) (requiring only that a protected ground "be *at least one* central reason for persecuting the applicant" (emphasis added)). The BIA's categorical rule runs contrary to the INA.

The BIA's stated rule also stands in contrast to the articulation of the nexus standard in its own prior precedential decisions. *See* 8 C.F.R. § 1003.1(g)(2) (2024) (noting certain BIA decisions, including those discussed here, "serve as precedents in all proceedings involving the same issue or

18

issues"). For instance, *J-B-N-* allowed asylum where an unprotected "reason for harm" exists, as least where the protected ground is more than "incidental, tangential, superficial, or subordinate to" that other reason. 24 I. & N. Dec. at 214; *see also L-E-A-*, 27 I. & N. Dec. at 44 (similar); *Dallakoti*, 619 F.3d at 1268 (endorsing the *J-B-N-* standard). And *S-P-* similarly recognized "[p]ersecutors may have differing motives for engaging in acts of persecution, some tied to reasons protected under the [INA] and others not." 21 I. & N. Dec. at 489. It is well established that "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

A hypothetical demonstrating how the BIA's rule works in practice helps further show why it is incorrect. Consider what the BIA in *L-E-A-* used as a quintessential example of nexus to a family-based PSG: "the well-known historical scenario of the Bolshevik assassination of Czar Nicholas II, his wife, Czarina Alexandra, and their five children after he abdicated the throne in 1917." 27 I. & N. Dec. at 44. As the BIA explained, "This is a classic example of a persecutor whose intent, for at least one central reason, was to overcome the protected characteristic of the immediate family." *Id.* Yet this persecution could also be framed as a means to other, unprotected ends, like fomenting political change. *Id.*

19

Consider what happens when this factual scenario is evaluated under the BIA's new rule. The antecedent ("if") condition is satisfied, because "a persecutor *is* targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground": political change. R.7 (emphasis added). Under the BIA's formulation, upon finding that motive, the inquiry prematurely ends, and the agency *must* then simply conclude "family membership *is* incidental or subordinate to that other ultimate goal and therefore *not* one central reason for the harm." R.7 (emphasis added). Thus, even this "classic example" of nexus in a mixed-motive case, *L-E-A-*, 27 I. & N. Dec. at 44, fails under the BIA's stated rule.[10]

We also find instructive *Mazariegos-Rodas*, a recent Sixth Circuit decision that considered the rule statement challenged here in analyzing the INA's "one central reason" requirement. 8 U.S.C. § 1158(b)(1)(B)(i); *see* 122 F.4th at 670–71. There, the Sixth Circuit "reject[ed] the government's" attempts to convince the court to adopt the BIA's new "bright-line rule" for mixed-motive cases involving family-based PSGs. *Mazariegos-Rodas*, 122 F.4th at 672. The court observed the BIA's "overly restrictive nexus standard

---

[10] In the dissent's view, "the majority reads something more problematic between the lines—seeing an embedded threat to mixed-motive claims." Dissent at 3; *id.* at 1 (suggesting the majority is "shadowboxing"). Not so. As we have explained, the problem is with the BIA's *stated* standard—not anything found between the lines of the BIA's opinion.

contradicts the [agency's] own pronouncements that '[i]n adjudicating mixed motive cases, it is important to keep in mind the fundamental humanitarian concerns of asylum,' and that '[s]uch an approach is designed to afford a generous standard for protection in cases of doubt.'" *Id.* at 671 (last two alterations in original) (quoting *S-P-*, 21 I. & N. Dec. at 492).

In rejecting the BIA's new standard, the Sixth Circuit—the only other court to have passed on this rule statement—concluded it is "overly restrictive" in terms of what asylum claims it allows and "unnecessarily broad" in terms of what it disallows.[11] *Mazariegos-Rodas*, 122 F.4th at 671. As the Sixth Circuit found, the BIA's stated formulation of the nexus standard contravenes the INA and many circuits' "recogni[tion] that a protected ground cannot be dismissed as an incidental or tangential reason for the persecution simply because a

---

[11] We note the Sixth Circuit determined the rule statement at issue was "dicta because [it was] 'unnecessary to the decision in the case' where the persecutors were motivated solely by a desire to obtain land." *Mazariegos-Rodas* v. *Garland*, 122 F.4th 655, 671 (6th Cir. 2024) (quoting *Richmond Health Facilities-Kenwood, LP* v. *Nichols*, 811 F.3d 192, 201 n.8 (6th Cir. 2016)). We disagree the standard is *dicta*. A holding, as contrasted with dicta, is a legal proposition "essential to [the court's] analysis." *United States* v. *Titties*, 852 F.3d 1257, 1273 (10th Cir. 2017). Here, the BIA stated its unlawful nexus standard *as the governing law*. *See* R.7. In the BIA opinion, this standard appears directly after several pages describing the INA's nexus requirement in 8 U.S.C. §§ 1101(a)(42)(A) and 1158(b)(1)(A). It is immediately followed by the section applying that standard to the facts of this case. And, as an amicus brief from former IJs and BIA members explains, this standard now requires IJs to engage in a new and impermissible analysis for family-based asylum claims. *See* Former IJ and BIA Members Amicus Br. at 5–19.

persecutor might have pecuniary goals," or other goals unrelated to protected grounds. *Id.* at 671 (collecting cases to this effect); *see also* CAIR Coal. Amicus Br. at 5–7 (collecting additional cases).

The government attempts to defend the BIA's nexus statement by rewriting what the BIA wrote. According to the government, the BIA's rule is sound because the agency

> reiterated its finding that a protected motive would not be sufficiently "central" if an aggressor was motivated by the protected characteristic *only* "as a means of achieving some other ultimate goal unrelated to the protected ground." If the protected characteristic was only a means to an unprotected end, it would be *merely* "incidental or subordinate" to that other non-protected end.

Resp. Br. at 32 (quoting R.7) (emphasis added). But that is not what the BIA's opinion *actually* says, nor is it a fair reading of how we should interpret it.

In urging us to agree the BIA's recited rule comports with applicable law, the government supplies critical language the BIA omits, like the words "only" and "merely."[12] It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan* v. *EPA*, 576 U.S. 743, 758 (2015) (citing *SEC* v.

---

[12] The dissent appears to make the same misstep as the government— defending the BIA's stated rule by first rewriting it. *See* Dissent at 1 (concluding the BIA's legal standard is correct because, "[i]n essence, the BIA found that when a protected reason for persecution arises *only* as a minor and subservient motivation, incidental to an unprotected motivation, there is no nexus.").

*Chenery Corp.*, 318 U.S. 80, 87 (1943)). And we cannot "support[] a result reached by the agency with reasoning not explicitly relied on by the agency." *Mickeviciute* v. *INS*, 327 F.3d 1159, 1165 (10th Cir. 2003). So we may look *only* to what the BIA actually says, not the arguments of counsel. The government does not acknowledge these well-settled principles here. Abiding them, we cannot add words to an agency's erroneous statement of law to make it correct and then approve it on appeal.

Accordingly, we hold the BIA's new rule statement contravenes the INA.

**3**

Petitioners level one additional charge against the BIA's stated nexus standard, but it is unavailing. The C.R. family correctly observes "that the nexus element [of an asylum claim under the INA] asks about the reasons the persecutor inflicted harm on the applicant, which requires an examination of the persecutor's motives." Reply Br. at 13. The C.R. family objects to BIA's articulation of that motive requirement. Recall, the BIA wrote, "If a persecutor is targeting members of a certain family *as a means* of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm." R.7 (emphasis added). The BIA errs, Petitioners contend, by framing "the 'one central reason' inquiry as a question about whether the protected ground was a 'means' or an 'end.'" Reply Br. at 13.

23

According to the C.R. family, the BIA wrongly "requires applicants (and adjudicators) to delve into the persecutor's mind, distinguishing whether the persecutor targeted the applicant as a 'means' to an ultimate goal, or whether the family membership was itself the persecutor's 'end.'" Op. Br. at 34. Our precedent forecloses this argument.

As the C.R. family acknowledges, the INA's nexus standard "makes motive critical," so applicants "must provide *some* evidence of it, direct or circumstantial." *INS* v. *Elias-Zacarias*, 502 U.S. 478, 483 (1992). More specifically, "[f]or persecution to qualify as on account of, the applicant must possess a protected characteristic and that protected characteristic must have motivated the persecutor to harm the applicant." *Orellana-Recinos*, 993 F.3d at 855–56 (alteration in original) (quoting *Li* v. *Ashcroft*, 356 F.3d 1153, 1160 (9th Cir. 2004)). "Where 'there [is] no evidence that the [persecutor] would be hostile toward the targeted [individuals] absent their [unprotected-ground-related] motives,' there is no nexus to a protected ground." *Miguel-Peña*, 94 F.4th at 1159 (first three alterations in original) (quoting *Orellana-Recinos*, 993 F.3d at 853).

This court has used a "means-ends" framing in describing this motive requirement, citing the BIA's *L-E-A-* opinion. We have summarized the nexus standard for family-based asylum claims by writing, "[M]embership in a [PSG] should not be considered a *motive* for persecution if the persecutors are simply

24

pursuing their distinct objectives and a victim's membership in the group is relevant only as a means to an end—that is, the membership enables the persecutors to effectuate their objectives." *Orellana-Recinos*, 993 F.3d at 856 (citing *L-E-A-*, 27 I. & N. Dec. 40). That framing comports with *J-B-N-*'s holding that the protected ground "cannot be *incidental*[ or] *tangential*." 24 I. & N. Dec. at 214 (emphasis added); *see Dallakoti*, 619 F.3d at 1268 (endorsing the *J-B-N-* standard). When a protected ground is *only* a means to an unprotected end, the persecutor's motivations can very often be described as *incidentally* or *tangentially* related to the protected ground—as the BIA recognized.

The BIA's rule statement on review here uses the term "means" in substantially the same way to describe motive. Under these circumstances, we discern no error because the BIA described the motive requirement as we did in *Orellana-Recinos*, consistent with the *J-B-N-* standard we have endorsed. *See In re Garcia*, 28 I. & N. Dec. 693, 695 (B.I.A. 2023) (reiterating that the BIA, "as well as [IJs], are bound to follow the precedent of . . . the circuit court of appeals with jurisdiction over the geographic region where a case occurs"); *Medina-Rosales* v. *Holder*, 778 F.3d 1140, 1143 (10th Cir. 2015) (finding "Tenth Circuit law applies" when IJ proceedings occurred in a city "in the Tenth Circuit").[13]

---

[13] To be sure, as the C.R. family contends, there could be ways to frame a persecutor's goals in terms of "means" and "ends" that *would not* comport

Petitioners resist this conclusion, contending the BIA should have imposed a standard that requires only "a causal connection between the protected ground and persecution." Reply Br. at 2. Among other cases, Petitioners seek to rely on the Fourth Circuit's case *Hernandez-Avalos*, which facially supports their position that causation alone can show motive. But, as the BIA identified, that circuit's nexus law stands in apparent tension with ours.

Understanding the crux of this tension requires comparing two opinions: the Fourth Circuit's in *Hernandez-Avalos* and this court's in *Orellana-Recinos*. In *Hernandez-Avalos*, a gang persecuted a mother for refusing to let her son join its ranks. 784 F.3d at 947. She applied for asylum in this country premised on the PSG of "her nuclear family." *Id.* at 950. The Fourth Circuit reversed the BIA's no-nexus finding, finding dispositive that the mother's "relationship to her son is why she, and not another person, was [persecuted], and the gang members' demands leveraged her maternal authority to control her son's activities." *Id.*

---

with the INA and this court's precedents. Returning to the example of Czar Nicholas II and his family, the assassination could be framed as a *means* to the unprotected end of fomenting political change—but, as explained, nexus to the family-based PSG exists in that case. Still, it does not follow that *every* rule statement that invokes a "means-ends" framing to describe motive necessarily contravenes the INA. And we hold only that we see no particular error in how the BIA used that framing *in this case*, given our precedents.

In *Orellana-Recinos*, "which is factually similar to" *Hernandez-Avalos*, this court took a different approach. 993 F.3d at 858. There, a gang threatened a mother to persuade her to help recruit her son to the gang. *Id.* at 853. In analyzing the mother's family-based asylum claim, we concluded, "To the extent that the Fourth Circuit's opinion [in *Hernandez-Avalos*] holds that a gang's threats to persuade a mother to encourage, or at least allow, a son to join the gang is necessarily persecution on account of the mother's membership in the son's nuclear family, we are unpersuaded." *Id.* at 858. Rather, "[e]ven if we assume that [the mother] was threatened by the gang only because she had influence over [the son] as his mother, the IJ and BIA could properly find that the threat was motivated solely by an interest in having [the son] join the gang." *Id.*

Here, the BIA rejected "the Fourth Circuit's approach—[which asks] why an applicant, and not others, is targeted"—for our approach in *Orellana-Recinos*. R.7. Petitioners argue that was in error, insisting *Hernandez-Avalos* and *Orellana-Recinos* are reconcilable because they both "properly applied the one central reason test and simply drew different conclusions based on the factual records before each court." Op. Br. at 48. Specifically, the C.R. family focuses on one factual distinction: in *Hernandez-Avalos*, the gang targeted only the mother to have her persuade the son to join their ranks, whereas in

*Orellana-Recinos*, the gang continued targeting the son as well. Op. Br. at 47–48.

We do not agree this factual distinction makes a dispositive difference. While the gang in *Orellana-Recinos* targeted both the son and the mother, only the mother applied for asylum. So this court *could have* applied the Fourth Circuit's reasoning that nexus is satisfied because the applicant's "relationship to her son is why she, and not another person, was threatened." *Hernandez-Avalos*, 784 F.3d at 950. But, instead, we explicitly rejected that logic and refused to overturn the BIA's no-nexus finding "[e]ven if we assume that [the mother] was threatened by the gang only because she had influence over [her son] as his mother." *Orellana-Recinos*, 993 F.3d at 858.

As the C.R. family points out, *Orellana-Recinos* suggested it disagreed with *Hernandez-Avalos* only "[t]o the extent that the Fourth Circuit's opinion holds that a gang's threats to persuade a mother to encourage, or at least allow, a son to join the gang is necessarily persecution on account of the mother's membership in the son's nuclear family." *Id.* (emphasis added). That case therefore left open the possibility that it was reconcilable with *Hernandez-Avalos*—at least "to the extent" the Fourth Circuit had, in fact, held something else. *Id.*

We need not decide here whether the Fourth Circuit can be understood as having held anything else. It is enough to find, *insofar as* the Fourth Circuit

28

holds causation suffices to show motive, that is inconsistent with this circuit's

law, for the reasons already discussed. We thus find no error in the BIA's legal

framing that requires more than causation *alone* to show motive under Tenth

Circuit law interpreting the INA's "one central reason" standard. 8 U.S.C.

§ 1158(b)(1)(B)(i); *see* R.7.[14]

The C.R. family also points to other out-of-circuit cases that it claims

show "a 'causal connection' between the protected ground and the

[persecution]" establishes motive. Reply Br. at 13. But our review of those cases

does not reveal any that holds but-for causation suffices to show motive under

the INA.[15] To the extent these cases support the conclusion that causation is

*relevant* to the motive inquiry, we do not disagree.

---

[14] Because it is unnecessary to our holding, we need not definitively conclude whether there may be some way to reconcile this circuit's and the Fourth Circuit's nexus standards.

[15] As an example, *Urgilez Mendez* v. *Whitaker* clarifies a causal connection "to a statutorily enumerated ground" is a *necessary* element of an asylum claim, but the court never says that connection is *sufficient* to establish motive. 910 F.3d 566, 570 n.2 (1st Cir. 2018). *Guzman Orellana* v. *Attorney General* simply notes the "causal connection between political opinion and persecution" is "a factual question." 956 F.3d 171, 177 n.11 (3d Cir. 2020) (citing *INS* v. *Elias-Zacarias*, 502 U.S. 478, 481–84 (1992)). And while *Osorio* v. *INS* finds a "persecutor's political motive is insufficient to infer the relevant *causal connection*, persecution on account of the victim's political opinion," its very next sentence clarifies "evidence of the persecutor's motive" remains "critical" under the INA, implying causation alone is not enough to show that motive. 18 F.3d 1017, 1029 (2d Cir. 1994) (emphasis added). The other cited cases are of a piece.

\* \* \*

Accordingly, we hold the BIA's stated rule for family-based nexus claims is contrary to the INA because its categorical formulation runs counter to the INA's "at least one central reason" standard. 8 U.S.C. § 1158(b)(1)(B)(i). But we find no error in the BIA's "means-ends" framing in its discussion of the INA's motive requirement.

## B

We now consider the Petitioners' claim that the BIA further erred by requiring asylum applicants to show animus to establish nexus under 8 U.S.C. §§ 1101(a)(42)(A) and 1158(b)(1)(B)(i). We cannot agree.[16]

We begin with our binding precedents on the topic. This circuit has confirmed some "kind of social/political animus" is "necessary to support an asylum claim." *Ustyan* v. *Ashcroft*, 367 F.3d 1215, 1217 (10th Cir. 2004). We have variously referred to this requirement as "animus," *Orellana-Recinos*, 993

---

[16] We acknowledge the error we identified above provides sufficient grounds to grant the petition for review and remand to the BIA, without considering any further contentions. Ordinarily, "[i]f it is not necessary to decide more, it is necessary not to decide more." *People for the Ethical Treatment of Prop. Owners* v. *U.S. Fish and Wildlife Serv.*, 852 F.3d 990, 1008 (10th Cir. 2017) (quoting *PDK Labs., Inc.* v. *DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part)). But here, we find it *is* necessary to decide more, for several reasons. *First*, judicial economy and efficiency favor providing the agency and the parties with fuller guidance on remand, to avoid repeated and piecemeal appeals. *Second*, these issues are fully legal, and we have all we need in the record to resolve them. *Third*, these issues are fully briefed to this court.

F.3d at 858, or "hostil[ity]," *Miguel-Peña*, 94 F.4th at 1159 (quoting *Orellana-Recinos*, 993 F.3d at 853). And we have identified this requirement as part of the nexus element. *See Orellana-Recinos*, 993 F.3d at 858; *Miguel-Peña*, 94 F.4th at 1159. But we have never specifically defined what we mean by animus in this context.

Here, the BIA held an asylum "applicant must demonstrate that the persecutor's motive for the harm is a desire to overcome the protected characteristic of the family or otherwise based on animus against the family." R.5 (citing *L-E-A-*, 27 I. & N. Dec. at 44–45; *Orellana-Recinos*, 993 F.3d at 858). From that, we can discern the BIA understood "a desire to overcome [a] protected characteristic" is one way to show animus—and, per the word "otherwise," other things can also constitute animus. The dispositive question is whether the BIA erred in holding Petitioners could establish animus for purposes of nexus by showing the persecutors harbored (i) "a desire to overcome [a] protected characteristic," or (ii) some "other[]" form of animus.

We discern no error. Beginning with the "desire to overcome" formulation, the BIA's articulation fits comfortably within the agency's prior elaborations on the subject. In *In re Kasinga*, the BIA clarified asylum applicants need not show "subjective 'punitive' or 'malignant' intent" to show persecution. 21 I. & N. Dec. 357, 365 (B.I.A. 1996). They can also show a person seeks "to overcome a characteristic of the victim"—a "formulation" that "has

31

its antecedents in concepts of persecution that predate the Refugee Act of 1980." *Id.* at 365; *see also id.* at 367 (citing *In re Diaz*, 10 I. & N. Dec. 199, 204 (B.I.A. 1963)). While elaborating most on that standard in its discussion of the *persecution* requirement for asylum, the BIA also applied a similar intent "to overcome" analysis as part of the *nexus* element. *Id.* at 367.

To illustrate what might constitute intent to overcome, take the facts of *Kasinga* itself. There, the applicant feared she would be subject to female genital mutilation (FGM) in her home country of Togo. *Id.* at 358–59. Those who practiced FGM may often have "subjectively benign intent," in that they do not apparently harbor ill will toward those subjected to the practice. *Id.* at 367. Still, the BIA found it important to its nexus analysis that "FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women of the [applicant's] tribe." *Id.* Intent to overcome can thus encompass seeking to eliminate an undesired trait tied to the protected ground (there, undesired sexual characteristics among young women of that tribe).

Similarly, consider an instructive Ninth Circuit precedent, *Pitcherskaia* v. *INS*, 118 F.3d 641 (9th Cir. 1997). There, the applicant had been arrested and subjected to involuntary institutionalization and harmful procedures for being a lesbian, which was considered, at least at the time, to be a medical disorder in her home country of Russia. *Id.* at 644. The Ninth Circuit found *Kasinga*'s "intent to overcome" standard instructive. *See id.* at 647. It thus

rejected a BIA requirement that the persecutor "harbored a subjective intent to punish." *Id.* at 648. It also rejected as irrelevant "[t]he fact that a persecutor believes the harm he is inflicting is 'good for' his victim," as the persecutors may have felt in that case. *Id.* While again mostly focused on the persecution element, the Ninth Circuit, like the BIA in *Kasinga*, rejected the notion that a "motive to inflict harm and suffering" is a necessary part of the nexus element. *See id.* at 647.

This circuit has signaled support for *Kasinga*'s "intent to overcome" standard by citing its discussion of FGM, but only as to the persecution element. *See Niang*, 422 F.3d at 1197.[17] Like the *Niang* panel, we find persuasive *Kasinga*'s recognition that intent "to overcome a characteristic of the victim" can constitute animus even without "a subjective intent to punish." *Kasinga*, 21 I. & N. Dec. at 365; *see Niang*, 422 F.3d at 1197. But the question we must answer in this case is whether the BIA erred in extending this formulation beyond the persecution element, finding "intent to overcome" can satisfy the animus requirement we have recognized for the nexus element.

We find no error. We agree with the BIA that, in line with *Kasinga* and *Pitcherskaia*, persecutors can intend to overcome an undesired characteristic

---

[17] We also looked to *Kasinga* to help inform whether an asserted PSG was cognizable, which is not at issue in this appeal. *See Niang* v. *Gonzales*, 422 F.3d 1187, 1200 (10th Cir. 2005).

33

related to a protected group—and thus harbor animus toward that group—even if they subjectively harbor no ill will toward the applicant or even believe the persecution is in the applicant's best interest. *Kasinga*, 21 I. & N. Dec. at 367; *Pitcherskaia*, 118 F.3d at 648. And the BIA correctly recognized "other[]" things besides "a desire to overcome" can also constitute animus.[18] R.5. The BIA thus did not err in its description of this animus requirement.

Petitioners advance several contrary arguments, but none is availing.

*First*, the C.R. family insists the BIA erroneously required an asylum applicant to prove animus to show nexus. But our precedent already makes clear animus is part of the motive inquiry to show nexus in this circuit. *See Orellana-Recinos*, 993 F.3d at 858 (requiring "animus" in analyzing nexus); *Miguel-Peña*, 94 F.4th at 1159–60 (assessing reasons the persecutor "would be hostile toward the" applicant in analyzing nexus (quoting *Orellana-Recinos*, 993 F.3d at 853)); *see also Xue* v. *Lynch*, 846 F.3d 1099, 1104 (10th Cir. 2017) ("We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." (quoting *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993))). The C.R. family attempts to explain away these holdings, claiming we "simply used" words like *animus* and *hostility* "as shorthand to distinguish harm inflicted because of the family

---

[18] We need not, and therefore do not, elaborate on what else might constitute animus for purposes of nexus.

relationship, versus harm that is purely motivated by an unprotected reason for harm." Op. Br. at 50. We decline to read our precedents as the C.R. family suggests, particularly when we did not include such a qualification.

*Second*, Petitioners further claim the BIA has not "explain[ed] why 'animus' is a permissible synonym for 'intent to overcome.'" Reply Br. at 22. To be clear, the terms are not synonyms, in the sense of being interchangeable. Rather, showing intent to overcome is *one way* to show animus. *See* R.5 (holding an asylum "applicant must demonstrate that the persecutor's motive for the harm is a desire to overcome the protected characteristic of the family *or otherwise* based on animus against the family" (emphasis added)). As the BIA has explained, that understanding is not new; rather, "[t]he 'seeking to overcome' formulation has its antecedents in concepts of persecution that predate the Refugee Act of 1980." *Kasinga*, 21 I. & N. Dec. at 365.

*Third*, the C.R. family insists a recent First Circuit opinion "directly affirms Petitioners' arguments that [the BIA opinion in this case] is invalid because it imposes an animus requirement." Pet'r May 13, 2025, Rule 28(j) Ltr. at 2. We acknowledge *Mayancela* v. *Bondi* found this BIA opinion's animus requirement inconsistent with precedent in the First Circuit. *See* 136 F.4th 1, 13 n.8 (1st Cir. 2025). But, as the government points out, the First Circuit's law, unlike our precedent, appears to "assume that 'animus,'" for nexus purposes, is "a narrow concept rooted in animosity." Resp't May 30, 2025, Rule

35

28(j) Ltr. at 1; *see also Pineda-Maldonado* v. *Garland*, 91 F.4th 76, 89 n.4 (1st Cir. 2024) (recognizing "[i]t is not entirely clear what the BIA and some of our sister circuits mean by 'animus,'" and framing the term as "refer[ring] to hatred of, or antagonism toward, the petitioner's family"). So, insofar as the First Circuit rejects only a narrow, animosity-focused animus requirement, that is reconcilable with today's holding, which also recognizes *Kasinga*'s "intent to overcome" standard. Insofar as the First Circuit instead rejects *any* animus requirement, then we recognize that court has acknowledged possible tension with this circuit's law, which, of course, binds this panel. *See Pineda-Maldonado*, 91 F.4th at 89 (citing *Orellana-Recinos*, 993 F.3d at 858).[19]

We thus hold the BIA's animus requirement—framed as including the concept of animus embodied in *Kasinga* and leaving open the possibility for "other[]" ways to show animus, R.5—was not in error.[20]

---

[19] We acknowledge the Sixth Circuit also found the animus requirement in the BIA opinion on review "is undercut by" that court's precedents. *Mazariegos-Rodas*, 122 F.4th at 671. But, as discussed, the same is not true of this circuit's precedents.

[20] Perhaps, as the C.R. family argues, this animus requirement as part of the *nexus* element is redundant with the similar animus requirement as part of the *persecution* element. But we need not interrogate here whether the animus requirements for those elements are identical, as it is enough to hold (i) this circuit already requires animus to show motive for nexus, (ii) that requirement can be satisfied with *Kasinga*'s "intent to overcome" standard, (iii) that requirement can be met even where the persecutor harbors no ill will, and (iv) the BIA did not err because it imposed a substantially similar requirement.

## C

Petitioners finally contend the BIA's opinion erroneously "[r]equir[es] applicants to show that an *additional* protected ground is present before granting a *family-based* [PSG] claim." Op. Br. at 53. If that were what the BIA had required, we agree that would be unlawful. But the BIA *actually* wrote,

> While not necessary to succeed on a family-based claim, one possible way for an applicant to establish that family status is one central reason for the claimed harm is by showing it is connected to another protected ground—such as political opinion—that is intertwined with or underlies the dispute.

R.5. The agency explicitly said the additional protected ground is "not necessary to succeed on a family-based claim," instead framing it as simply "*one possible way* for an applicant to establish that family status is one central reason for the claimed harm." R.5 (emphasis added). We discern no error.

## IV

As we have explained, the BIA's categorical "if-then" rule does not comport with the INA. That we reject Petitioners other challenges is no antidote to this threshold error. Given this holding, we now consider what remedy is required.

The C.R. family urges us to remand to the BIA "for further agency action because the [nexus] standard the Board applied to this case was unlawful." Op. Br. at 58. The government does not respond to this point, beyond arguing the BIA's stated standard was lawful. The government similarly does not argue

37

any doctrine like futility bars a remand. *See Zapata-Chacon* v. *Garland*, 51 F.4th 1191, 1196 (10th Cir. 2022) (clarifying remand is not required when "governing law would "'*require*[]" [the agency] to reach a "necessary result"'" (alterations in original) (quoting *Gutierrez-Zavala* v. *Garland*, 32 F.4th 806, 810 (9th Cir. 2022))). It does, however, argue

> [t]he record in this case amply supports the agency's conclusions that Petitioners failed to make a threshold showing that the persons they feared were motivated to harm them because of their family membership and that, at best, their family membership was only incidental to the aggressors' primary non-protected goal of controlling Madera.

Resp. Br. at 40–41. The government urges the deferential substantial-evidence standard, applicable to the factual question of why the cartel persecuted the C.R. family, requires us to deny the petition for review.

We cannot leave uncorrected an agency's precedential misstatement of the law. The BIA's stated nexus standard improperly disallows mixed-motive claims. *See* 8 U.S.C. § 1158(b)(1)(B)(i) (requiring only that a protected ground "was or will be *at least one* central reason for persecuting the applicant" (emphasis added)). This unlawful standard governs a dispositive issue and appears in a published three-judge BIA opinion, so it "serve[s] as precedent in all [agency-level] proceedings involving the same issue." *Villegas-Castro* v. *Garland*, 19 F.4th 1241, 1247 (10th Cir. 2021); *see* 8 C.F.R. § 1003.1(g)(2)

38

(similarly indicating published BIA opinions "serve as precedents in all [IJ and BIA] proceedings involving the same issue or issues").

When applied, this unlawful standard improperly requires the agency to "ignore . . . evidence in the asylum applicant's favor." *Karki*, 715 F.3d at 800 (quoting *Espinosa-Cortez*, 607 F.3d at 107). According to its plain terms, once the agency determines "a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground," the analysis stops, and "family membership" must then be "incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm"—*full stop*. R.7.

The BIA's erroneous legal standard thereby deems some facts legally irrelevant: it requires the agency to disregard other possible motives as soon as the antecedent ("if") condition is satisfied. As the C.R. family put it, under this new rule, "any record evidence establishing that family was at least one central reason for harm [i]s categorically insufficient for asylum seekers to meet their burden of proof in establishing nexus" once an unprotected-ground-related motive is found. Op. Br. at 37. We have rejected that analytical shortcut, as motives that are unrelated to protected grounds "do not negate" possible motives related to protected grounds. *Karki*, 715 F.3d at 802. One of our sister circuits has persuasively found the BIA errs when it "erroneously stop[s] short" by "f[inding] one motive and prematurely end[ing] its analysis

there." *Sebastian-Sebastian* v. *Garland*, 87 F.4th 838, 848 (6th Cir. 2023).

Stopping short in that way is exactly what the BIA's new "if-then" rule requires.[21]

The pernicious effects of leaving this unlawful statement uncorrected are easy to imagine. And we cannot simply assume the agency tacitly applied a standard different from the one it articulated. We therefore conclude remand with vacatur is appropriate.[22] Because we are remanding for the BIA to correct its misstatement of law, we decline the C.R. family's invitation to "find that

---

[21] The C.R. family further alleges the BIA's new rule stands contrary to the INA's "establishment of a uniform nexus standard that applies to all asylum seekers, regardless of the protected ground at issue." Op. Br. at 10. Perhaps that is one way to read this new rule, which facially applies only to "members of a certain family" who are advancing asylum claims based on their "family membership." R.7; *see* 8 U.S.C. § 1101(a)(42) (not establishing a different legal standard for different protected groups, except in circumstances not relevant here involving population control); *id.* § 1158(b)(1)(B)(i) (also not distinguishing among protected groups). On the other hand, only a family-based asylum claim was before the BIA in this case, so perhaps it is fairer to read the BIA as using the claim before it to illustrate the standard—not establishing a different standard for only family-based claims. In any event, on remand, the BIA should ensure it does not hold different protected grounds to different legal standards without a statutory basis. *See Negusie* v. *Holder*, 555 U.S. 511, 520 (2009) (noting "the Refugee Act"—which amended the INA— "was designed to provide a general rule for the ongoing treatment of all refugees and displaced persons").

[22] No party asks for a remedy short of remand with full vacatur— including remand without vacatur or remand with partial vacatur—in the event we find the BIA legally erred. We therefore vacate the BIA decision fully, as we do in the normal course. *See, e.g.*, *Karki* v. *Holder*, 715 F.3d 792, 807 (10th Cir. 2013) (vacating a BIA decision on asylum and withholding of removal after finding the BIA had committed legal error).

40

they have established nexus," Op. Br. at 66, instead leaving that issue for the agency to determine first under the proper nexus standard.[23] *See INS* v. *Ventura*, 537 U.S. 12, 16 (2002).

* * *

The BIA imposed an unlawful nexus standard for family-based asylum claims under 8 U.S.C. §§ 1101(a)(42)(A) and 1158(b)(1)(B)(i) when it held, "If a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm." R.7. On remand, the BIA should both correctly state and apply the proper nexus standard.

## V

We **GRANT** the petition for review, **VACATE** the BIA's opinion, and **REMAND** to the BIA for further proceedings consistent with this opinion.

---

[23] According to the dissent, "although I agree with the balance of the majority opinion, including its holding on motive requirements, I see no reason to decide this case differently from *Orellana-Recinos*, and would affirm." Dissent at 7. In other words, the dissent seems willing to assume the BIA applied the law correctly. But we decline to make that assumption or otherwise prefigure the BIA's decision on remand.

41

23-9609, *O.C.V. v. Bondi*

**TYMKOVICH**, Circuit Judge, dissenting in part and concurring in part.

I agree with the majority's assessment of the facts and the relevant legal standards for nexus that govern this case. Even so, I would affirm the BIA's decision, because I read its articulation of the legal standard to be correct. In essence, the BIA found that when a protected reason for persecution arises only as a minor and subservient motivation, incidental to an unprotected motivation, there is no nexus. That is consistent with the BIA's prior articulations of its rule, and our own explanations of the rule. *See, e.g.*, *Matter of L-E-A-*, 27 I. & N. Dec. 40 (B.I.A. 2017); *Orellana-Recinos v. Garland*, 993 F.3d 851 (10th Cir. 2021). We said in *Orellana-Recinos* that family membership "should not be considered a motive for persecution" where it is used "as a means to an end." 993 F.3d at 856. The BIA recited this standard, and then applied it to the facts on appeal. Where the majority finds a misapplication of the law, I see only shadowboxing.

A person seeking asylum under the INA must establish "persecution or a well-founded fear of persecution *on account of* race, religion, nationality, *membership in a particular social group*, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphases added). The C.R. family argues the circumstances that drove them from their home amount to persecution on account of their membership in a particular social group—their family.

No doubt, family membership can qualify as a particular social group in some cases. But to prove this, the C.R. family must show that their family membership

was "at least one central reason" they were persecuted. *Id.* § 1158(b)(1)(B)(i). It need not be the only reason, but it must be a *central* reason. Many cases have grappled with asylum seekers claiming that family ties were a central reason for their persecution. As a result, there are rules for when family does, and does not, satisfy the test. The majority recounts many of these cases in its opinion, and I agree with its general framing of the legal landscape. But I read the BIA's Opinion to agree with our case law and am unpersuaded that it committed legal error in its explanation and application of the law.

The C.R. family and the majority focus on one particular passage from the BIA's opinion: "If a persecutor is targeting members of a certain family as a means of achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal and therefore not one central reason for the harm." *Matter of M-R-M-S-*, 28 I. & N. Dec. 757, 762 (B.I.A. 2024). Our court has described this rule in very similar terms, as has the BIA. *See Orellana-Recinos*, 993 F.3d at 856 ("[M]embership in a particular social group should not be considered a motive for persecution if the persecutors are simply pursuing their distinct objectives and a victim's membership in the group is relevant only as a means to an end."); *L-E-A-*, 27 I. & N. Dec. at 40 ("the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground"); *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 214 (B.I.A. 2007) ("[T]he protected ground cannot play a minor role in the alien's past mistreatment or fears of future mistreatment.

2

That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm. Rather, it must be a central reason for persecuting the respondent.").

In other words, if family members are targeted only to achieve some other objective, the family membership is not a central reason for the persecution. Straightforward enough. But the majority reads something more problematic between the lines—seeing an embedded threat to mixed-motive claims. See Maj. Op. 18–19.

Mixed-motive claims arise when a persecutor has more than one central motivation—even if one motivation is unprotected, the claim may succeed if at least one other *central* motivation is protected. *See* 8 U.S.C. § 1158(b)(1)(B)(i). "Of course, a persecutor can have multiple motives for targeting someone." *Orellana-Recinos*, 993 F.3d at 855.

The BIA's statement of the law complies with our mixed-motive precedents. Nowhere does the complained-of "if-then formulation" suggest that family persecution cannot be a shared motivation with other, unrelated goals. It states only that where "targeting members of a certain family" is a "means of achieving some other ultimate goal unrelated to the protected ground," it is the ultimate goal that is a central reason, and not the incidental means. *M-R-M-S-*, 28 I. & N. Dec. at 761; *J-B-N-*, 24 I. & N. Dec. at 214 ("one central reason" language means "the protected ground *cannot* play a minor role in the alien's past mistreatment or fears of future mistreatment. That is, it *cannot* be incidental, tangential, superficial, or subordinate to another reason for harm.") (emphases added).

3

The majority objects that "[t]he BIA's new rule says an asylum applicant cannot show nexus if a motive unrelated to a protected ground exists." Maj. Op. 18. I cannot find such a categorical bar in the BIA's opinion. The BIA did not reject the asylum claim because an unprotected ground merely *exists*, but because the protected ground was *subordinate and incidental* to that unprotected ground. Its ruling was conditional on the finding that "forcing the existing occupants off the land was incidental to the primary objective of obtaining the land itself" and that "[a]lthough the cartel forced the respondents and others from the land, the record does not indicate that the cartel held any specific animus against the respondents' family apart from their occupation of the land." *M-R-M-S-*, 28 I. & N. Dec. at 762–63.

Although we have repeatedly endorsed the viability of mixed-motive claims, we have never held that a protected characteristic can be both a subordinate reason *and* a central reason for persecution. Rather, like the BIA, we have uniformly held the two are mutually exclusive. *See Miguel-Pena v. Garland*, 94 F.4th 1145, 1160–61 (10th Cir. 2024), *cert. denied,* 145 S. Ct. 545 (2024) (protected grounds "*cannot be incidental, tangential, superficial, or subordinate*") (emphasis added); *Orellana-Recinos*, 993 F.3d at 855 (same); *Karki v. Holder*, 715 F.3d 792, 800–01 (10th Cir. 2013) (same); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 646 (10th Cir. 2012) (same); *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010) (same). The majority stealthily undermines this uniform case law.[1]

---

[1] In a footnote, the majority notes that neither the parties in this case nor in *Orellana-Recinos* challenged the framework of *L-E-A*. See Maj. Op. 17, n.9. But we

Of primary concern to the majority seems to be that the BIA did not continue its inquiry into the primacy of the family-related persecution even after it concluded that familial relationships were a means to the end of land acquisition. See Maj. Op. 17–19. But given our extensive case law suggesting the two are mutually exclusive, I see no reason for the BIA to have gone farther in this case. The BIA may not "simply ignore[ ] . . . substantial evidence," true. Maj. Op. 17 (quoting *Karki*, 715 F.3d at 802). But the majority identifies no information ignored by the BIA, nor does it clarify what further inquiry the BIA should conduct. That is because the BIA's nexus inquiry is already complete. It concluded both that an unprotected ground for persecution exists, *and* that family status was merely the incidental means used to pursue the unprotected end.

If the applicants here were not a family but unrelated owners and occupants of land pursued by La Linea they would face the same persecution. Likewise, there is no evidence that the family would be persecuted if they had no claim to the land wanted by La Linea. *Miguel-Pena*, 94 F.4th at 1160–61 ("[T]here is no nexus when 'there is no evidence that the gang would be hostile toward the targeted individuals absent their [non-protected] motives.'" (quoting *Orellana-Recinos*, 993 F.3d at 858) (citation modified)). Given that La Linea has driven other landowners off land nearby, their persecution is motivated by family ties only when it is coterminous with

---

have now applied that framework in *Orellana-Recinos*, 993 F.3d at 856, and in *Miguel-Pena*, *See* 94 F.4th at 1159. *Orellana-Recinos* is good law, we are bound by it. No party has suggested we overrule those cases today, and the majority does not claim to.

land ownership. So the BIA was correct to conclude that *Orellana-Recinos* treats their family persecution as incidental and subordinate to the unprotected persecution. 993 F.3d at 858; *see also*, *L-E-A-*, 27 I. & N. Dec. at 47 (noting a lack of family nexus where "the cartel would have gone after any family who owned a business there."). Like the BIA, I would reject the nexus theory advanced by the family here.

The majority points to a recent Sixth Circuit case, *Mazariegos-Rodas v. Garland*, 122 F.4th 655 (6th Cir. 2024). In that case the Sixth Circuit chose to follow precedent from the Fourth Circuit holding that "inextricably intertwined" protected and unprotected grounds for persecution could support a claim for asylum even in a situation like this one, where family is used as a proxy for other interests. *Id.* at 672–73.

But that case does more to prove that *M-R-M-S-* aligns with our case law. As the BIA observed, our own Circuit's precedents diverge from those holdings because they treat subordinate reasons and primary reasons as mutually exclusive. *See Orellana-Recinos*, 993 F.3d at 858 ("To the extent that the Fourth Circuit's opinion holds that a gang's threats to persuade a mother to encourage, or at least allow, a son to join the gang is necessarily persecution on account of the mother's membership in the son's nuclear family, we are unpersuaded."); *see also Lopez v. Att'y Gen. United States of Am.*, 142 F.4th 162, 181 (3d Cir. 2025) (Hardiman, J., concurring in part and dissenting in part) (noting the Tenth Circuit's departure from the Fourth Circuit's nexus holding in *Orellana-Recinos*). Nor is this a case in which protected and unprotected grounds are inextricably intertwined—we know that other families,

6

outside the C.R. family, have been driven from their homes for the same reasons. The majority may be right that *M-R-M-S-* conflicts with Third, Fourth, and Sixth Circuit law, but the BIA specifically wrote it in line with *Orellana-Recinos*. *M-R-M-S-*, 28 I. & N. Dec. at 761 ("In our view, the Tenth Circuit's approach is the proper way to analyze whether membership in a family-based particular social group is one central reason for harm. The question asked under the Fourth Circuit's approach—why an applicant, and not others, is targeted—is relevant in evaluating the reasons for harm, but it is not the end of the analysis."). In light of our long line of contrary precedent, the Sixth Circuit's holding should be no more persuasive than the Fourth Circuit's.

In sum, although I agree with the balance of the majority opinion, including its holding on motive requirements, I see no reason to decide this case differently from *Orellana-Recinos*, and would affirm.

7